IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.:  1:17CR00507-001 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| -vs- | ) | |
| | ) | |
| CHARLES DAVID SNYDER, | ) | **DEFENDANT'S SENTENCING** |
| | ) | **MEMORANDUM AND** |
| Defendant. | ) | **MOTION FOR DOWNWARD** |
| | ) | **DEPARTURE AND/OR VARIANCE** |
| | ) | |

Now comes Defendant, CHARLES DAVID SNYDER, by and through undersigned counsel, and respectfully moves this Honorable Court to consider, as part of his allocution, the following *Sentencing Memorandum*, prior to passing final judgment upon him. Furthermore, the Defendant, by and through counsel, respectfully moves this Honorable Court for a downward departure and/or variance from the advisory Guideline sentencing range ultimately determined by this Honorable Court, for the reasons more fully set forth in the *Sentencing Memorandum and Motion for Downward Departure and/or Variance,* attached hereto and incorporated herein by reference.

Respectfully Submitted,

/s/ Larry W. Zukerman\
LARRY W. ZUKERMAN, Esq. (0029498)
S. MICHAEL LEAR, Esq. (0041544)
Zukerman, Daiker & Lear, Co., L.P.A.
3912 Prospect Ave. East
Cleveland, Ohio 44115
(216) 696-0900 telephone
lwz@zukerman-law.com
sml@zukerman-law.com
Counsel for Charles David Snyder

## SENTENCING  MEMORANDUM

### I.    STATEMENT OF THE CASE

On December 6, 2017, a grand jury for the Northern District of Ohio returned an eight (8) count indictment charging Charles David Snyder with:  seven (7) counts of Willful Failure to Collect, Account for, or Pay Over Tax, in violation of 26 U.S.C. 7202 and 18 U.S.C. 2 (Counts 1, 2, 3, 4, 5, 6, and 7); and one (1) count of Embezzlement from an Employee Benefit Plan, in violation of 18 U.S.C. 664 and 18 U.S.C. 2 (Count 8).

Following a jury trial, on June 12, 2018 Charles David Snyder was found guilty of Counts 2, 4, 5, 6, 7, and 8.

### II. LAW & ARGUMENT

Following *United States v. Booker*, 543 U.S. 220 (2005), sentencing courts should engage in a three-step approach to federal sentencing:

First, the Court should determine and apply the applicable advisory sentencing guideline range. *See, Gall v. United States*, 552 U.S. 38 (2007). Second, the Court should determine whether a departure is consistent with the guidelines. *See, United States v. McBride*, 434 F. 3d 470 (6th Cir. 2006) (holding that departures are still a relevant consideration for determining the appropriate guideline sentence).

Third, the Court should determine whether a variance outside the advisory guideline system is warranted under the authority of 18 U.S.C. §3553(a). "As the United States Supreme Court explained in [*Rita v. United States* (2007), 551 U.S. 338], a district court should begin all sentencing proceedings by correctly calculating the applicable guideline range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States, supra*. "Accordingly, after giving both parties

an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the 18 U.S.C. § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, the district judge may not presume that the Guideline range is reasonable. He must make an individualized assessment based on the facts presented." *Id.*

1) **DETERMINING THE APPLICABLE ADVISORY SENTENCING RANGE AND OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT:**

Charles David Snyder respectfully objects to the advisory guideline calculations set forth in the Presentence Investigation Report. Relative to his objections, as they relate to the calculation of the advisory guideline calculations and corresponding advisory sentencing range, Mr. Snyder hereby asserts as follows:

**OBJECTIONS:**

**Paragraphs 7 and 8:**

The Offense Conduct lists "From 2009 through January 31, 2013". The charges set forth in the indictment only related to the first three (3) quarters of 2010 and all four (4) quarters of 2012 and Mr. Snyder was acquitted of the charges relative to the 1st and 3rd quarter of 2010. Accordingly, the Offense Conduct should only include the 2nd quarter of 2010 and all four (4) quarters of 2012. Mr. Snyder, through Attevo, in 2010 and 2011 paid the Internal Revenue Service (IRS) $2,657,164 in payroll taxes.  Mr. Snyder was compliant during three quarters of 2010 and throughout 2011 and, as such, all of 2009, three quarters of 2010, and all of 2011 should not be considered as "Offense Conduct".  Accordingly, Mr. Snyder objects to the inclusion of these periods as part of the "Offense Conduct".

Mr. Snyder has never denied that he did not pay <u>all</u> of his employees' federal withholding taxes in 2010, FICA (Federal Insurance Contributions Act taxes) and in 2012, but he did pay <u>significant</u> taxes and attempted to pay the remaining liabilities due through the Attevo IRS

installment agreement (total paid $483,350).  The presentence investigation report (sometimes referred to herein as "the Report") leaves the impression that <u>nothing</u> was paid, which is misleading and inaccurate.   During the time periods, Mr. Snyder, on behalf of Attevo, always filed Forms 941, reported all of the wages paid, the payroll taxes due and, if liabilities remained, accurately reported those as well.   The Report omits these acts of compliance.  The Great Recession commenced in late 2008, early 2009, causing many businesses and banks to fail (NCB locally) due to severely restricting business loans and overall credit markets.  As a result, Attevo experienced severe cash flow problems.

Mr. Snyder entered into a monthly installment agreement with the IRS in September, 2011.  Under the plan, Snyder, through Attevo made <u>ten</u> monthly payments of $48,350.00 for a total of $483,350.00 (October of 2011 through August of 2012).  These payments were over and above the payroll tax deposits which were made for three (3) quarters of 2010 and all four quarters of 2011.

**Paragraph 9:**

The presentence investigation report decries Mr. Snyder's claim he did not have the funds available to pay the trust fund taxes.  The report then speaks of his living in a "large house on Lake Erie." The residence referred to was purchased in <u>1996</u> and was sold in late 2007. Although Mr. Snyder paid rent for this residence, he did so pursuant to a contractual lease agreement that pre-dates the trust fund tax liabilities in the within matter. Mr. Snyder objects to the inclusion of this finding in the Report as his living arrangements in 2007 are not related in any fashion to either the original charges in this case, the counts of acquittal or the counts of conviction. Simply stated, Mr. Snyder incurred significant contractual lease obligations *prior to the 2008 financial*

*crisis which led to Attevo's trust fund tax liability issues.* At the time that Mr. Snyder entered into these contractual obligations, Attevo was current in its tax obligations.

Paragraph 9 also asserts that Mr. Snyder "embezzled cash from Attevo's corporate cards through cash advances."  Snyder objects to the inclusion of the term "embezzlement".  There are no allegations of embezzlement in this case related to the use of corporate credit cards.  The term is misleading and inaccurate.

As for the $1.1 million-dollar loan from the State of Ohio, which came from a fund, "Ohio Innovation Loan Fund", with the purpose of expanding technology jobs in the State.  The Fund had a formal application process which Attevo followed, including personal interviews and reviews of the intellectual property (IP) by outside independent panels.  Mr. Snyder had little, if any, involvement with the process because the software in question, he knew nothing about.

Finally, Mr. Snyder repeats his objection to the "Offense Conduct" period from 2009 through January 31, 2013.  That is not the accurate "Offense Conduct" period for the reasons stated above.

**Paragraph 10**:

Again, "October, 2009" and January, 2009 through August 2013 is included relative to the payments on the rental houses, but this time frame is not and should not be included as "relevant conduct".

 **Paragraph 11**:

Mr. Snyder continues his Objection to the time period referenced.  If the Report leaves in the expenses as stated, the installment agreement payments during the same time frame should also be included.  Installment agreement payments to the IRS during the same time frame were paid in the amount of $483,350.

**Paragraph 12**:

Mr. Snyder did <u>not</u> choose to not pay employment taxes.  Mr. Snyder Objects to this paragraph.  There is no evidence that Attevo "maintained the funds necessary to pay over the employees' portion . . .".  In fact, evidence was quite the contrary.  The funds were <u>not</u> available but he continued over a ten (10) month period to pay over $483,350.00 as well as <u>trying</u> to keep current with other obligations which included paying taxes, salaries, and other expenses.

**Paragraph 13**:

Mr. Snyder Objects to the inclusion of the Table (and its comments) in Paragraph 13 because it is inaccurate and misleading.  The computation of the tax loss is inaccurate as it includes periods in which Mr. Snyder was acquitted, periods of which do not constitute relevant conduct, and additional computations for employer matching portions of liabilities which were not charged in the instant case and which are not relevant to the computation of tax loss or restitution for Mr. Snyder.  Further, Mr. Snyder's intended tax loss is actually $0.00, as several government witnesses testified that Mr. Snyder/Attevo *always intended to pay all trust fund tax liabilities in full* and, further, the IRS installment agreement evidenced this intention. As such, the *intended* loss amount is $0.00. Alternatively, the tax loss can be found to include periods of conviction, or actual tax loss, namely, the 2nd quarter, 2010, as well as, all four (4) quarters of 2012, which totals $535,592.73.

Finally, the Table fails to take into consideration the payments made to the IRS from October 2011 through August, 2012.  These arguments are outlined further below.

Mr. Snyder's tax loss computations are more fully stated in Objection to Paragraph 17 below.

**Paragraph 14:**

Mr. Snyder Objects to the failure to include the repayment of the 401(k) funds, which included additional payments for return on his employees' 401(k) investments, thereby making the 401(k) fund completely whole. Mr. Snyder, prior to the commencement of the criminal matter, appeared in court and agreed to a repayment plan with the U.S. Department of Labor. He complied with the payment plan in whole and paid over $143,000 to restore the Plan in total.

Mr. Snyder also Objects to the "extravagant lifestyle" reference. Again, Mr. Snyder's "extravagant lifestyle" essentially amounted to contractual lease obligations for two parcels of real property – one in Lakewood, Ohio and one in Chautauqua, New York – that predated the 2008 Great Recession. During this time frame, he was funding ongoing payroll and other business-related expenses.

**Paragraph 15:**

Mr. Snyder made complete restitution to the 401(k) Plan with interest in the amount of $143,481.42, which the report acknowledges. Payments were made to the Department of Labor pursuant to a civil suit with an eventual consent decree. It should be noted that the final payment was in November of 2015 – more than two years before Mr. Snyder was indicted.

Per correspondence from L. Joe Rivers, Regional Director, Cincinnati Regional Office, US Department of Labor …. "Since you have taken the Court-ordered corrective action with respect to the specific violations detailed in the Consent Order and Judgment, the Department will take no further action with respect those matters except the imposition of a civil penalty, as required by ERISA section 502(I)."

**Paragraph 16:**

Mr. Snyder Objects to the total computation. The tax loss is either $0 or $535,592.73 as detailed in paragraph 17 below. There is no loss to the Department of Labor.

**Paragraph 17:**

To the extent this Section suggests as such, Mr. Snyder objects to any statement that monies are owed to the Department of Labor. As noted in the Report, he fully paid this liability through a consent agreement with the DOL before he ever learned of the parallel criminal investigation.

Mr. Snyder also objects to the tax related Restitution figure of $2,344,987.74. As relevant to the sentencing hearing, the **"tax loss under the Sentencing Guidelines is usually the intended loss, while the amount of restitution is always limited to an actual loss."** DOJ Criminal Tax Manual, Tax Loss vs. Actual Loss, 44.03[5] (2016). The intended loss in this case is $0. Government witnesses Joseph Burmester, Michael Beh, Leslie Page and Irawati Santosa all testified that Attevo was transparent in its disclosure of payroll tax liabilities and that they understood that Attevo was attempting to pay the balances due the IRS. Through Mr. Snyder, Attevo entered into an agreement with the IRS to pay the liabilities due at the time, agreeing to pay $48,350 per month to full pay those liabilities.

Furthermore, the starting point for the Restitution calculations is the amount of the "Trust Fund" portion of the liability only, which totals $535,592.73. *See* Table 1. *United States v. Lord*, 404 Fed. Appx. 773, 779 (4th Cir. 2010) citing *Hugley v. United States*, 495 U.S. 411, 413 (1990) ("Restitution is allowed only 'for the loss[es] caused by the specific conduct that is the basis of the offense conviction.") As a result, it is inappropriate to include the uncharged 2009 liability, employer's portion, or acquitted periods in the restitution calculations.

**Table 1**

| Period | Amount |
|---|---|
| June 30, 2010 | $ 4,814.67 |
| March 31, 2012 | $ 178,488.78 |
| June 30, 2012 | $ 181,739.47 |
| September 30, 2012 | $ 132,365.55 |
| December 31, 2012 | $ 38,184.26 |

| Total | $ 535,592.73 |
|-------|--------------|

However, this starting point does not take into account the Post-Trial, Advanced Restitution payments made by the Defendant totaling $30,000 thus far. *See* Table 2.

**Table 2**

| Payment Date | Amount |
|--------------|--------|
| August 1, 2018 | $ 10,000 |
| September 4, 2018 | $ 10,000 |
| September 26, 2018 | $10,000 |
| **Total** | **$ 30,000** |

As a result, it is Mr. Snyder's position that his Restitution figure is $515,592.33 (as of September 10, 2018).

**Paragraphs 18 and 26**:

Mr. Snyder Objects to the inclusion of this Paragraph in the Report. Mr. Snyder did not obstruct justice under Guideline 3C1.1 for speaking with Gerald Hoch about whether money given to Mr. Snyder was an investment or a loan. Mr. Hoch and Mr. Snyder are friends. They have met continuously 3-4 times a year for the last 6 years. Mr. Snyder had no knowledge that Mr. Hoch was a government witness until months later just prior to trial. Mr. Hoch never testified that he felt intimidated, coerced, or threatened in any manner in the conversation he had with Mr. Snyder.

In the Application Notes, the Committee sets forth a non-exhaustive list of examples of the types of conduct constituting an Obstruction of Justice. (See A-K) Mr. Snyder did not threaten, intimidate, or unlawfully influence Mr. Hoch, attempt to suborn perjury, produce an altered document, destroy or procure another person to destroy documents. None of those other examples apply to Mr. Snyder. Otherwise, any defendant who speaks with a potential witness could be assessed 2 points for obstruction.

9

Application Note 5 sets forth conduct that does <u>not</u> constitute Obstruction under this guideline.  (A-E)  Notwithstanding Mr. Snyder did not engage in any of that conduct, "he took no substantial step [or any step] toward persuading a witness to commit perjury."  *United States. v. Horn*, 113 Fed. App. 355,357 (10th Cir. 2004), referenced with approval in *United States. v. Emerson*, 886 F.3d 568, 578-79 (6th Cir. 2018).  The testimony of Mr. Hoch does not support a finding by a preponderance of the evidence that Mr. Snyder obstructed justice.  886 F.3d at 578.  See *United States v. Tilga,* 824 F. Supp.2d 1295 (D. New Mex 2011) holding that where a defendant stated she "was not going to take the fall" and a codefendant was "going to pay" [for this] did not constitute an obstruction of justice under 3C1.1.  The "statements do not threaten [codefendant] or otherwise indicate that he should do anything to impede the investigation...."  *Id.* at 1338.

Application Note 2 provides: "This provision is not intended to punish a defendant for the exercise of a constitutional right."  (Right to investigate, contact witnesses)  Mr. Snyder's call to Mr. Hoch discussing a loan/investment issue "are not the kind of statements aimed at obstructing justice."  828 F. Supp.2d at 1338.

If a defendant who calls a potential witness in a non-intimidating, non-coercive manner and who never suggests perjury can be assessed with obstruction of justice, the process puts a chilling effect on a defendant's right to contact and interview witnesses.  The 2 point enhancement should not be assessed.

**Paragraphs 19, 40:**

Mr. Snyder should receive a 2 point credit for Acceptance of Responsibility under 3E1.1(a).  Application Note 1 provides in relevant part:

> "1. In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:
>
> > (C)    voluntary payment of restitution prior to adjudication of guilty; ...
> >
> > (H)    the timeliness of the defendant's conduct in manifesting the acceptance of responsibility."

As previously discussed, Mr. Snyder entered into an installment plan in September of 2011 to pay the IRS the entire liability due, with interest, over a period of approximately sixty (60) months. He accepted responsibility for the liability. Notwithstanding the agreement, IRS Revenue Officer Terry testified that it was her intention to levy Attevo out of business, and did not care about its employees or their families. Despite the tax lien and Ms. Terry's efforts, Mr. Snyder, on behalf of Attevo, was able to pay $483,500.00 before Attevo was forced to close.

As for the 401k issue, Mr. Snyder entered into an agreement with the Department of Labor to restitute the fund which was accomplished at the end of December, 2015. Mr. Snyder paid all of the money back with interest. This was accomplished approximately two (2) years before indictment.

Application Note 2 provides:

> "Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g. to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct.)"

Years before he was charged, Mr. Snyder accepted responsibility for the Attevo trust fund tax liability and the 401k issue as was reflected throughout the trial. Multiple government

witnesses testified at trial that it was *always the intention of Snyder/Attevo to pay the trust fund tax liability in full.* Accordingly, there has always been an acceptance of responsibility by Mr. Snyder on behalf of Attevo that the Attevo trust fund tax liability was owed. At trial, Snyder contested the willfulness issue. See *United States v. Fells,* 78 F.3d 168, 172 (5th Cir. 1996) where the Fifth Circuit held that the district court's denial of acceptance of responsibility was error where the defendant went to trial and "freely admitted all the facts" but argued that the underlying facts did not constitute "possession."

Similarly, Mr. Snyder not only acknowledged his tax and 401k obligations years before the indictment, but he also made substantial payments toward the tax issues and made complete restitution on the 401k issue. His challenge at trial was that he did not act willfully.

Like the defendant in *Fells,* supra., Mr. Snyder should receive a 2 point reduction for acceptance of responsibility.

**Paragraphs 20 – 42:**

**For the reasons stated above, Mr. Snyder Objects to the Offense Level Computations, the Adjusted Offense Level, as well as, the Multiple Count Adjustment and Total Offense Level. Mr. Snyder submits that the Total Offense Level in this case is 4, which is the *intended* tax loss, as well as, the 401(k) related losses.**

As previously noted, **"tax loss under the Sentencing Guidelines is usually the intended loss, while the amount of restitution is always limited to an actual loss."** DOJ Criminal Tax Manual, Tax Loss vs. Actual Loss, 44.03[5] (2016). Mr. Snyder respectfully asserts that the "intended" loss in the within matter is $0.00, as numerous government witnesses testified that it was always the intention of Snyder/Attevo to pay all of its delinquent trust fund

taxes to the IRS in full. Accordingly, calculating the guideline based on the "intended" tax loss, results in the following advisory guideline range:

| | |
|---|---|
| **Base Offense Level   Section 2T1.6 ($0.00)** | **6** |
| **Specific Offense Characteristics: None** | **0** |
| **Victim Related Adjustment: None** | **0** |
| **Adjustment for Obstruction of Justice (Does not apply)** | **0** |
| **Adjusted Offense Level** | **6** |
| **Acceptance of Responsibility** | **-2** |
| **Total Adjusted Offense Level** | **4** |

Alternatively, if the "actual" loss amount is used to calculate the advisory guidelines, Mr. Snyder submits that the Total Offense Level in this case is 16, which is the actual loss in this matter, representing the tax periods of conviction, to wit; 2nd quarter 2010 and all four (4) quarters of 2012, as follows:

| | |
|---|---|
| **Base Offense Level   Section 2T1.6 ($535,592.73)** | **18** |
| **Specific Offense Characteristics: None** | **0** |
| **Victim Related Adjustment: None** | **0** |
| **Adjustment for Obstruction of Justice (Does not apply)** | **0** |
| **Adjusted Offense Level** | **18** |
| **Acceptance of Responsibility** | **-2** |
| **Total Adjusted Offense Level** | **16** |

The above-calculations relate to the calculations set forth in the PSI in paragraphs 22-27.

Relative to Count 8, Snyder objects to the calculations set forth in the PSI in paragraphs 28-34. Relative to Specific Offense Characteristics, the Application Notes for 2B1.1 state, relative to "Loss", as follows:

> 3.       Loss Under Subsection (b)(1). – This application note applies to the determination of loss under subsection (b)(1).
>
> (A)      General Rule. – Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.
>
> (i)      Actual Loss. – *"Actual loss"* means the reasonably foreseeable pecuniary harm that resulted form the offense.
>
> (ii)     Intended Loss. – *"Intended loss"* (I) means the pecuniary harm that the defendant purposely sought to inflict and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

Here, evidence adduced at trial clearly established that it was always the intent of Snyder/Attevo to pay the withheld 401(k) funds and, accordingly, there was no intended loss (clearly Snyder did not purposely seek to inflict any pecuniary harm. Further, as Snyder paid back all funds (plus the value of those funds) into the 401(k) fund, the 401(k) fund was made whole *prior to his knowledge of any parallel criminal investigation,* and, accordingly, there was no "actual loss", i.e., there was no "reasonably foreseeable pecuniary harm that resulted from the offense. Thus, the "Specific Offense Characteristics" as to Count 8 is $0.00.

Further, as to Specific Offense Characteristics, Snyder objects to the 2 level increase set forth in paragraph 30, as the offense only involved 1 "victim", i.e., the 401(k) fund. Snyder therefore objects to this 2 level increase, and asserts that there was not "10 or more victims".

Accordingly, Snyder objects to the PSI advisory guideline calculations relative to Count 8 and asserts that the guidelines should be calculated as follows:

**Base Offense Level (2B1.1)**                                              **6**

**Specific Offense Characteristics USSG 2B1.1(b)(1)(A):  0**

**Specific Offense Characteristics USSG 2B1.1(b)(2)(A):  0**          **(Does not apply)**

**Victim Related Adjustment: None**                          **0**

**Adjustment for Role in the Offense:**                       **2**

**Adjustment for Obstruction of Justice:**                 **0**

**Adjusted Offense Level:**                                   **8**

With respect to paragraphs 35 – 41, i.e., the Multiple Count Adjustment, Snyder asserts that based on his calculations, the following applies:

**(Under the "Intended Harm" Adjusted Offense Level Scenario):**

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| **Count 8** | **8** | **1** |
| **Counts 2, 4, 5, 6, 7** | **6** | **.5** |
| **Total Number of Units:** | | **1.5** |
| **Increase in Offense Level:** | | **1** |
| **Greater of the Adjusted Offense Levels Above:** | | **8** |

| | |
|---|---|
| **Increase in Offense Level:** | **1** |
| **Combined Adjusted Offense Level:** | **9** |
| **Chapter Four Enhancement:** | **0** |
| **Acceptance of Responsibility:** | **-2** |
| **Total Offense Level:** | **7** |

**(Under the "Actual Harm" Adjusted Offense Level Scenario):**

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| **Counts 2, 4, 5, 6, 7** | **18** | **1** |
| **Count 8** | **8** | **.5** |
| **Total Number of Units:** | | **1.5** |
| **Increase in Offense Level:** | | **1** |
| **Greater of the Adjusted Offense Levels Above:** | | **18** |
| **Increase in Offense Level:** | | **1** |
| **Combined Adjusted Offense Level:** | | **19** |
| **Chapter Four Enhancement:** | | **0** |
| **Acceptance of Responsibility:** | | **-2** |
| **Total Offense Level:** | | **17** |

**<u>Further clarification of Objections to the Base Offense Level as to Counts 2, 4, 5, 6, 7:</u>**

Mr. Snyder specifically objects to the base level offense of 22 in the PSI (as to Counts 2, 4, 5, 6, 7). The following portions of USSG § 1B1.3 are applicable regarding relevant conduct as it pertains to this matter:

(1)  (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2) solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4) any other information specified in the applicable guideline.

**a. It is inappropriate to include the 2009 liability as relevant conduct.**

Mr. Snyder maintains that the 2009 liabilities are not properly includable as relevant conduct.

Application Note 5B of the US Sentencing Guidelines defines "same course of conduct or common scheme or plan" as:

(i)  <u>Common scheme or plan</u>. For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar <u>modus operandi</u>.

(ii)  <u>Same course of conduct</u>. Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of

17

conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required.

USSG §1B1.3, Application Note 5B.

As noted in Mr. Snyder's *Reply to Government's Response in Opposition to Defendant's Motion for Judgment of Acquittal, or, in the Alternative, Motion for New Trial* (Doc. No. 115), the great recession in the fall of 2008 triggered JP Morgan Chase reducing Attevo's line of credit, then subsequently terminating Attevo's line of credit, which subsequently led to JP Morgan Chase "terming" the Attevo debt. The evidence at trial was clear that the great recession of *2008* was the precipitating factor that began the catastrophic financial downward spiral of Attevo. Prior to the great recession of 2008, an event that Attevo had no control over, Attevo had no trust fund tax delinquencies.  Attevo's liabilities were assigned to Revenue Officer Terry for collection which ultimately culminated in an Installment Agreement.  Attevo then made 10 payments towards this Installment Agreement totaling $483,350.00.

As discussed during trial, and again in the *Reply to Government's Response*, the evidence at trial established that Revenue Officer Evelyn Terry of the IRS filed the IRS tax lien against Attevo in March, 2011, in an effort to "put them out of business." The fact that this event occurred in 2011, and not in 2012 as asserted by the government, is significant, because the IRS tax lien precipitated Attevo employees leaving Attevo and stealing Attevo clients.  The below Table reflects the impact of the lien filing.

| Year | Gross Receipts |
|------|----------------|
| 2010 | $ 11,423,710 |
| 2011 | $ 8,185,107 |
| 2012 | $ 2,673,297 |

It is also understood that "a lapse in time between prior conduct and the offense of conviction does not necessarily indicate that a defendant abandoned a particular course of conduct; rather, such a lapse may result when participants are forced to put the venture 'on hold.'" *United States v. Hill*, 79 F.3d 1477, 1483 (6th Cir. 1996) citing *United States v. Cedano-Rojas*, 999 F.2d 1175, 1180 (7th Cir. 1993).  However, such a scenario does not apply in this case.  In *Cedano-Rojas*, the gap in the defendant's criminal activity (selling drugs) was due to his supplier being incarcerated and not because of any decision to change his ways.  That is distinguishable to this case where the 2009 liabilities were being addressed with attempts at resolution (through the Installment Agreement or failed Offer-in-Compromise).  Further, it must be said that when indicted, the statute of limitations was still open for the 2009 tax liabilities but the Government chose not to charge those periods.  As a result, it is inappropriate to now render that behavior criminal when the Government did not, for whatever reason, choose to charge.

Therefore, there was a sufficient break in time between the unpaid 2009 liabilities and the accrual of the 2012 liability.  During this interim, Attevo fully paid 7 of the 8 quarters[1] and also entered into a payment plan with the government to resolve the liabilities.  As a result, although the liabilities are similar in nature (they are all Form 941 liabilities), they are not part of the same course of conduct or common scheme or plan.

**b. It is inappropriate to include the acquitted periods of Q1 2010 and Q3 2010 as relevant conduct.**

---

[1] By way of reminding, please keep in mind that Attevo fully paid the first and third quarters 2010, but due to the IRS movement of payments, those periods still show liabilities.  As a result, the liability table is not a fully accurate picture of the amount of the liability.

Furthermore, Mr. Snyder objects to the inclusion of the 1st and 3rd Quarters 2010 in the calculation of relevant conduct.  The standard for including acquitted conduct can be found in *Us v. Watts*, "…a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."  *United States v. Watts*, 519 U.S. 148,157 (1997).  However, as the evidence in this case showed, Attevo full paid the liabilities for these quarters.  As a result, it is inappropriate to include these periods in the calculation of relevant conduct.

**c. It is inappropriate to include the employer match in the calculation of relevant conduct.**

Additionally, Mr. Snyder objects to the inclusion of the employer's portion of the liability in the calculation for tax loss.  Section 2T1.6 sets the Base Offense Level from Section 2T4.1, the tax table, corresponding to the tax *not collected or accounted for and paid over, i.e.,* that portion of the employment taxes collected but not accounted for and paid over from the employees' portion of the FICA taxes.  Here the criminal figures are the trust fund taxes described in Section 2T1.6. The Report erroneously concludes that the employer's portion of the FICA taxes is "relevant conduct." That portion is always the employer's obligation, not comprehended by Section 7202.  As the employer, Attevo, is a separate legal entity, the Government would either have to bring charges against the entity or Section 7201 charges against Mr. Snyder for the employer portion to be included as "relevant conduct". The government did not do so. Accordingly, the inclusion of the *employer* portion in the tax loss calculation is erroneous and completely inappropriate.

| Quarter Ending | Employee's Portion |
|---|---|
| June 30, 2010 | $    4,814.67 |
| March 31, 2012 | $ 178,488.78 |
| June 30, 2012 | $ 181,739.47 |
| September 30, 2012 | $ 132,365.55 |
| December 31, 2012 | $   38,184.26 |
| **Total** | **$ 535,592.73** |

d. **It is appropriate to include the First Offender adjustment.**

Finally, Mr. Snyder Objects and/or respectfully submits that the the recently adopted amendments to the U.S. Sentencing Guidelines which take effect on November 1, 2018, should be considered by this Honorable Court, notwithstanding the fact that sentencing herein may or will occur prior to November 1, 2018.

"[A] district court may adjust a defendant's sentence based on its agreement with developing policy." *United States v. Napper*, 2014 U.S. App. LEXIS 25161, *5 (6ᵗʰ Cir. 2014)(citing *United States v. Herrera-Zuniga*, 571 F.3d 568, 585-586 (6ᵗʰ Cir. 2009)).

The United States Sentencing Commission has noted that its proposed amendment to the Sentencing Guidelines for first offenders "is primarily informed by the Commission's multi-year study of recidivism, including the circumstances that correlate with increased or reduced recidivism" and "by the Commission's continued study of alternatives to incarceration."[2] "Recidivism data analyzed by Commission indicate that 'first offenders' generally pose the lowest risk of recidivism."[3]  The Sentencing Commission has also supported its proposed amendment of lowering the total offense level for first offenders by noting that 28 U.S.C. § 994(j) directs that alternatives to incarceration are generally appropriate for first offenders not

---

[2] *Id*. at 27.
[3] *Id*. at 28.

convicted of a violent or otherwise serious offense and that such an amendment would further implement the congressional direction at section 994(j).[4]

Under Section 4C1.1, First Offender, "If the defendant is determined to be a first offender under subsection (a), decrease the offense level as follows:

(2) if the offense level determined under Chapters Two and Three is less than level [16], decrease by [2] levels; or

(3) if the offense level determined under Chapters Two and Three is level [16] or greater, decrease by [1] level.]] ".

Again, although sentencing will likely occur prior to November 1, 2018, Mr. Snyder respectfully asserts that this adopted amendment should be considered by this Honorable Court and, if this Court does so, Mr. Snyder respectfully asserts that he would constitute a "First Offender" as that term has been defined. Depending upon what the Total Offense Level is, Mr. Snyder should receive either a 1-point reduction if the Offense Level is 16 or higher or, if the Offense Level is lower than 16, a 2-point reduction pursuant to this amendment.

**Paragraphs 78 and 85:**

Mr. Snyder Objects to the Total Offense Level of 25. He submits that the corrected Offense Level should either be 4, 6 or 16, depending upon the receipt of acceptance of responsibility and the actual or intended tax loss finding.

Paragraphs 78 and 85 state that since Mr. Snyder "is in Zone D of the Sentencing Table, the defendant is ineligible for probation." Respectfully, the Sentencing Guidelines are advisory only, and not mandatory. Violations of 26 USC 7202 and 18 USC 664 do not require a mandatory minimum sentence.

**Paragraph 92:**

---

[4] *Id.* at p. 29.

Mr. Snyder Objects to the amount of restitution to be order as stated in the Report.

**Paragraph 103:**

As more fully discussed above, Mr. Snyder objects to this restitution calculation. Furthermore, the Defendant maintains that the IRS Restitution has been paid in full taking into account the $483,350 in payments made in 2011 and 2012.  In the alternative, the Defendant maintains that the remaining Restitution is $515,592.73.

## 2) DETERMINING WHETHER A DEPARTURE IS CONSISTENT WITH THE GUIDELINES

### *Motion for Downward Departure*

**USSG § 5K2.0 - Grounds for Departure (Policy Statement)**

As a preliminary matter, USSG § 5K2.0, entitled Grounds for Departure (Policy Statement) provides:

    (a)    UPWARD DEPARTURES IN GENERAL AND DOWNWARD DEPARTURES IN CRIMINAL CASES OTHER THAN CHILD CRIMES AND SEXUAL OFFENSES.-

    (1) IN GENERAL. – The sentencing court may depart from the applicable guideline range if-

    (A)    in the case of offenses other than child crimes and sexual offenses, the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance; or

    * * *

    of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described.

    (2) DEPARTURES BASED ON CIRCUMSTANCES OF A KIND NOT ADEQUATELY TAKEN INTO CONSIDERAION. –

    (A)    IDENTIFIED CIRCUMSTANCES. – This subpart (Chapter Five, Part K, Subpart 2 (Other Grounds for Departure)) identifies some of the circumstances that the

23

Commission may have not adequately taken into consideration in determining the applicable guideline range (*e.g.,* as a specific offense characteristic or other adjustment). If any such circumstance is present in the case and has not adequately been taken into consideration in determining the applicable guideline range, a departure consistent with 18 U.S.C. § 3553(b) and the provisions of this subpart may be warranted.

(B)     UNIDENTIFIED CIRCUMSTANCES. – A departure may be warranted in the exception case in which there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence.

(3)     DEPARTURES BASED ON CIRCUMSTANCES PRESENT TO A DEGREE NOT ADEQUATELY TAKEN INTO CONSIDERATION. – A departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense.

(4)     DEPARTURES BASED ON NOT ORDINARILY RELEVANT OFFENDER CHARACTERISTICS AND OTHER CIRCUMSTANCES.— An offender characteristic or other circumstance identified in Chapter Five, Part H (Offender Characteristics) or elsewhere in the guidelines as not ordinarily relevant in determining whether a departure is warranted may be relevant to this determination only if such offender characteristic or other circumstance is present to an exceptional degree.

Here, Charles David Snyder asserts that, generally, a downward departure is warranted for a number of circumstances and based on a number of offender characteristics and other circumstances.

Initially, Mr. Snyder respectfully asserts that USSG § 5K2.0(a)(1)(A) permits this Court to depart downward from the applicable guideline range if this Court determines that there exists "mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence

different from that described". See, 18 U.S.C. § 3553(b)(1). Mr. Snyder respectfully asserts that in the within matter, there exists such mitigating circumstances. Specifically, relative to the nature and circumstances of the offense, Mr. Snyder specifically believes that such mitigating circumstances include, but are not limited to, the following:

(a) That the great recession of 2008, a circumstance that could not have been reasonably foreseen, contributed greatly to the economic decline of Attevo;

(b) That as a result of the great recession, Attevo's line of credit was lowered and/or "termed", resulting in a loss of economic fluidity by Attevo and/or resulting in Attevo operating solely on cash-flow (with little to no credit to rely on), and ultimately resulting in monthly payments being withdrawn from Attevo's operating accounts;

(c) That the great recession of 2008 further harmed Attevo's cash-flow due to its effect on Attevo's client-base;

(d) That pursuant to several government witnesses, it was always the intent of Attevo and/or Mr. Snyder to pay the IRS all of the past due trust fund taxes;

(e) That the IRS filed a tax lien on Attevo, resulting in several of Attevo's most effective employees to leave Attevo and take from Attevo many of Attevo's most lucrative clients, further contributing to Attevo's economic decline;

(f) That Attevo made ten (10) monthly installment payments to the IRS to pay back past-due trust fund taxes;

(g) (As to Count Eight), Charles David Snyder has previously paid the Department of Labor all of the monies, including the value of said monies, that had withheld from employees of Attevo and Ruralogic.

Accordingly, Mr. Snyder respectfully asserts that these factors, and others as adduced at the trial, constitute mitigating offense circumstances that warrant a downward departure in the within matter. Such offense circumstances are permissible to warrant downward departure pursuant to USSG § 5K2.0(a).

Further, Charles David Snyder respectfully asserts that there exist offender characteristics and other circumstances that warrant downward departure pursuant to USSG § 5K2.0(a)(4), as set forth below.

**Relevant Policy Factors that Warrant Downward Departure**

This Honorable Court should find that any and/or all of the policy factors listed below are applicable to Charles David Snyder, as they constitute offender characteristics or other circumstances that, although not ordinarily relevant in determining whether a departure is warranted, may be relevant to this determination as they are present "to an exceptional degree".

**SPECIFIC OFFENDER CHARACTERISTICS:**

**A) USSG § 5H1.1 (Age) and/or USSG § 5H1.4 (Physical Condition, etc.)**

Charles David Snyder respectfully moves this Honorable Court to depart downward from the Defendant's applicable sentencing guideline range, due to his advanced age of 66 and/or his current physical condition.

USSG §5H1.1. Age (Policy Statement), provides:

> Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration. Physical condition, which may be related to age, is addressed at §5H1.4 (Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction).

26

*See* USSG §5H1.1.

USSG § 5H1.4. Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction (Policy Statement), states, in relevant part:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; *e.g.,* in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

This Honorable Court should grant a downward departure because Mr. Snyder is of an advanced age that, in combination with his recent heart problems and fragile health, will both exacerbate a sentence of imprisonment more than an average prisoner and also tax the institution's resources. Mr. Snyder respectfully asserts that his age and/or physical condition constitute offender characteristics that are present to an unusual degree and distinguish this case from the typical cases covered by the guidelines.

Charles David Snyder is currently 66 years old. If placed in an institution, his advanced age may make him a conspicuous target of other prisoners and/or may make him less resilient than a younger prisoner.

As noted by the policy statement, a departure may be warranted "if considerations based on age, individually *or in combination with other offender characteristics,* are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines". Charles David Snyder respectfully asserts that his age, coupled with his current health, constitute a combination of offender characteristics that "are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines". Currently, Mr. Snyder is in poor

health and is under the care of a physician due to concerns of coronary artery disease. *See PSR*[5]

*report at 11.* Mr. Snyder recently underwent invasive surgery in order to have placed several

stents in his heart. Although the surgery was successful, the surgery has had side effects and Mr.

Snyder suffers from decreased energy and other side effects. *Id.* Mr. Snyder is currently

undergoing cardiac rehabilitation.

In a letter from MARCO A. COSTA, MD, dated June 25, 2018, Dr. Costa writes:

> Mr. Charles David Snyder has been seen in outpatient clinic on Friday, April 20, 2018 due to concerns of coronary artery disease. Based on his symptoms and risk factors, we suspected coronary artery obstruction and recommended a hear catheterization which is scheduled to be performed on Thursday, June 28, 2018.

> This procedure could confirm presence of coronary obstructions that may require coronary revascularization – either bypass surgery or angioplasty with stent – which would require overnight or additional days of hospitalization.

*See Exhibit A, Letter of Marco A. Costa, MD.*

In a letter to this Honorable Court, TONY GEORGE, a friend of Mr. Snyder's for over

15 years, writes, n relevant part:

> During the end of June, I realized that I hadn't heard from David in a few days. I contacted his wife and learned that he had been hospitalized and had 3 stents placed due to heart issues. I find it very ironic that my previously healthy, energetic friend has recently had serious heart issues and a noticeable decline in energy. It is clear this prosecutorial event has taken a physical toll on a very respectable person. What it is doing to him and his family emotionally and mentally is immeasurable.

> I have spent a lot of time in the last few months with Dave, Michelle and even their oldest daughter, Page. I have seen how the trial and conviction are affecting Dave and his family. Their children are distraught wondering if their father is going to be removed from their daily lives. I know the kind of father and husband that Dave is. I know the kind of businessman Dave Snyder is. I respectfully ask, Your Honor, that you consider these important points when determining the sentence.

*See Exhibit P letter from Tony George.*

---

[5] As of the date of this Sentencing Memorandum, undersigned counsel has not yet received the final PSR. As such, references herein are to the initial PSR.

As a consequence of his heart issues, Mr. Snyder is required to take several medications daily. *See PSR.* These medications are in part to combat symptoms from Diabetes, Double Vessel Disease, and high cholesterol.  Finally, Mr. Snyder also requires a medical exam every six months to monitor a node that was discovered in his left lung. *Id.*

If this Court imposes a term of imprisonment upon Mr. Snyder, the institution will be burdened with providing medical care and treatment of Mr. Snyder. Further, the stress of imprisonment upon Mr. Snyder, as well as upon Mr. Snyder's family, may be detrimental to Mr. Snyder's health.

In light of Mr. Snyder's advanced age and/or current physical condition, this Honorable Court should consider a community control sanction such as house arrest or probation that is equally efficient and less costly than incarceration due to the unique advanced age and health characteristics of Charles David Snyder. Accordingly, Mr. Snyder respectfully moves this Honorable Court to depart downward.

**B) USSG § 5H1.6. Family Ties and Responsibilities (Policy Statement)**

This Honorable Court should depart downward from the Applicable Guidelines range in the present matter because Charles David Snyder is the sole economic provider, and irreplaceable support system, for his wife and four of his children. In particular, Mr. Snyder's absence may inflict particular hardship on his daughter Page, who has PTSD related to treatment of cancer and who is in very fragile physical health that requires medical attention several times a year. The type of hardship/suffering that would result to the entire family, but specifically Mr. Snyder's daughter Page, if Mr. Snyder is sentenced to a term of imprisonment (the legitimate risk of a steep decline in his daughter's health) is *not* the type of hardship and/or suffering that is ordinarily incident to imprisonment.

USSG §5H1.6. Family Ties and Responsibilities (Policy Statement), provides:

> In sentencing a defendant convicted of an offense other than an offense described in the following paragraph, family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted.
>
> In sentencing a defendant convicted of an offense involving a minor victim under section 1201, an offense under section 1591, or an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code, family ties and responsibilities and community ties are not relevant in determining whether a sentence should be below the applicable guideline range.
>
> Family responsibilities that are complied with may be relevant to the determination of the amount of restitution or fine.

However, the Application Note to USSG §5H1.6, provides:

> **Application Note:**
>
> 1.  Circumstances to Consider.—
>
> (A) **In General**.—In determining whether a departure is warranted under this policy statement, the court shall consider the following non-exhaustive list of circumstances:
>
>> (i)    The seriousness of the offense.
>>
>> (ii)   The involvement in the offense, if any, of members of the defendant's family.
>>
>> (iii)  The danger, if any, to members of the defendant's family as a result of the offense.
>
> (B) **Departures Based on Loss of Caretaking or Financial Support**.— A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to the court's consideration of the non-exhaustive list of circumstances in subdivision (A), the presence of the following circumstances:
>
>> (i)    The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.
>>
>> (ii)   The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated

defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii)   The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv)   The departure effectively will address the loss of caretaking or financial support.

**Thus, although family circumstances are not ordinarily relevant, such circumstances may form the basis for a downward departure in certain circumstances.**

Here, Charles David Snyder respectfully asserts that a downward departure is warranted as a sentence of imprisonment will result in the loss of caretaking or financial support to the Snyder family.

In *U.S. v. Spero*, 382 F.3d 803 (8th Cir.2004), the Eighth Circuit Court of Appeals affirmed a District Court's decision that allowed a downward departure based on exceptional family circumstances.  There, the defendant pled guilty to bank fraud and skimming. *Id.* at 804. The District Court applied a downward departure based on its authority under U.S.S.G. § 5K2.0, and sentenced the defendant to a mixed sentence of community confinement, home detention, and probation. *Id.*

In making its decision, the District Court considered several factors that led it to the conclusion that this was the exceptional case. It found pertinent that (1) the defendant had four children, (2) one of the children had a variety of mental disorders, (3) the defendant was a very important part of his child's life, and (4) the slightest change would cause the child to become upset. *Id.* at 804.

31

Additionally, the District Court considered the medical evidence provided by the child's doctor. *Id.* at 805. The doctor described the "child as very attached and close to his father." *Id.* The doctor further established that in his opinion the removal of the father from the house would be "detrimental" to the child. *Id.* The court found that when "one parent is critical to a child's well-being, as in this case, that qualifies as an exceptional circumstance justifying a downward departure." *Id.* The Eighth Circuit Court of Appeals agreed with the District Court's reasoning and upheld the downward departure.

In *United States v. Aihe,* 2004 WL 2434713 (Oct. 15, 2004), the District Court of Minnesota granted the defendant a downward departure based on exceptional family circumstances. In that case, the defendant pled guilty to multiple counts of wire and mail fraud. *Id.* at *1.

In deciding whether to apply a downward departure for exceptional family circumstances, the District Court considered defendant's home situation. Defendant had two disabled children, one of which required chronic blood transfusions. *Id.* at *6. The defendant further was the child's primary caretaker. *Id.* Finally, the District Court found that the defendant's wife was unlikely to be able to take care of the two disabled children because of depression resulting from a recent miscarriage. *Id.* Based on the above factors, the District Court found that the family circumstances were exceptional and sentenced the defendant to reduced prison term of five (5) months incarceration, followed by five (5) months home detention and three (3) years supervised release. *Id.*

This Honorable Court should find that the circumstances found in *Spero* and *Aihe* are present in this case as well, and warrant a downward departure for exceptional family hardship.

In the instant matter, Charles David Snyder is the proud father of six children, four of whom still rely upon him for means of financial support and caretaking. As previously noted, two of these children have been afflicted with recurring medical issues. In particular, Defendant's eldest daughter Page Snyder requires recurring medical attention and is at particular risk of acute problems developing if Mr. Snyder is imprisoned.

Doctors diagnosed Page Snyder with Acute Lymphoblastic Leukemia in 2004. *See PSR at 11*. Unfortunately, the treatment program was initially ineffective, and medical staff was forced to use a more aggressive and harmful second round of treatment. *Id.* The consequence of the repeated treatments mean that Page Snyder will be at risk for late-effect cognitive disorders and heart related issues. *Id.* Several medical professionals have written this court opining about the problems Page may face going forward.

In a letter to this Court, DR. ISSAM NEMEH touches on the medical history and possible complications in regards to Page Snyder. In relevant part, Dr. Nemeh writes:

> . . . I first met David in February 2005 at a prayer service held at St. Ignatius High School in Cleveland, Ohio. I am a medical doctor who conducts healing prayer services through my affiliation with Path to Faith. He came up tearfully holding his daughter Page, then 3 ½ years old, who was diagnosed with leukemia. While I was praying with David and Page, the hurt and anguish in his eyes spoke volumes of his love, strength and hope for a miracle for his daughter.
>
> I continued to see David and his wife Michelle as they accompanied their daughter Page to medical appointments in my office. Oftentimes David would leave the treatment room tearful to regain his composure so that his daughter would not see him upset at what she was going through. This was an extremely traumatic time for David and his whole family.
>
> I am fully aware of the situation David is facing, but I am also cognizant of the heavy grief and anguish this is causing not only him, but also his wife, Michelle, and four children – Page, John, Grace and Kate. I have only known David to be a very dedicated husband and father. One of my primary concerns is the medical condition of Page, who has been in remission of cancer. As a physician, I am concerned that his stress may have a negative effect on the health and wellbeing of Page.

> David has expressed sorrow and regret for the decisions that he has made. His faith and devotion to his family has remained strong. ***Sentencing David to anything more than probation would be traumatic to his family. . . .***
> (Emphasis added).

*See Exhibit C letter from Dr. Nemeh.*

DR. DEBORAH GHAZOUL, the pediatrician for Mr. Snyder's four children with Michelle, also expresses her concerns in a letter to this Court. Dr. Ghazoul has known Mr. Snyder and Michelle for 17 years, since the birth of Page Snyder. In relevant part, Dr. Ghazoul writes:

> . . . In November 2003, I diagnosed their son, John, with a Dermoid Cyst that required a pediatric neurosurgeon to perform a Bifrontal Craniotomy due to Intracranial Extension. The surgery took place in January 2004. Later that year, in November 2004, sadly, I diagnosed their 3 year old daughter, Page, with Leukemia. It was during this very challenging year that I learned what strong people the Snyder's are. I have seen many families destroyed because of a child's illness. It takes an enormous amount of strength both physically and emotionally for a family to remain as strong as the Snyder's have. Dave and Michelle held the family together and remained resilient as a married couple.
>
> When Page began chemotherapy remission was not achieved as quickly as needed and she received an augmented treatment protocol. Page was hospitalized for lengthy periods of time. While Michelle stayed with Page in the hospital, Dave stayed at home with their 19 month old twins, John and Grace, and their 4 month old daughter, Kate. Dave did an amazing job providing a consistent, loving environment all while continuing to provide financially for his family. He had recently started a new technology consulting company, Attevo, and had the responsibility of maintaining employment for others as well.
>
> Page completed treatment in April of 2007. Because of the chemotherapy she received, she is at risk for future health issues including heart problems, late effect cognitive disorders, and secondary malignancies. Page's disease presented through a sinus infection. She suffers several sinus infections each year which understandably causes her parents distress each time.
>
> A few years after Page completed treatment, she displayed anxiety related to her medical care. She is currently being evaluated at Rainbow Babies and Children's Hospital for PTSD. This is sometimes seen in survivors of childhood cancer. While her mom, Michelle, tries to remain strong during these emotionally fueled episodes, it is David who is the foundation of support for Page. He attends many

of Page's appointments with her and I can see the effect of the strong and loving method of comfort he provides. David is truly a "hands on" dad who does not deny his children love and support.

I enjoy caring for the Snyder children. They are one of my most cherished families simply because of the amount of time we have spent together with illness. I have gotten to know each one of them over the years. They are intelligent, compassionate, comical, respectful and loving. I can see the admiration they have for their father. He provides daily guidance and love. Dave's children are his number one priority. Watching their eyes light up and smiles become so side at the office when he enters the room is heartwarming. Fear of needles and other procedures is gone when he holds them. Teenagers need their parents now more than ever. This special interaction between Dave and the children is essential for their continued positive self- image and success during these ever changing teenage years. Dave and Michelle are extraordinary parents and I can say without hesitation that Dave is the backbone of this family.

I respectfully ask you to take the above information into consideration when determining the future for David Snyder and his family. ***I am certain that the lack of daily love and support from their father will have detrimental effects.*** (Emphasis added).

*See Exhibit B  letter from Dr. Deborah Ghazoul.*

ANN STRATTON, a pediatric nurse practitioner, witnessed firsthand David Snyder's character during one of the most, if not the most, difficult and challenging times of David Snyder's life. Specifically, Ms. Stratton first met David and David's family thirteen years ago when David's daughter Page was diagnosed with leukemia. In her letter, Ms. Stratton writes, in relevant part:

. . . The care and devotion he showed for his wife and children were amazing. He, and his wife, were able to educate themselves to protect their children as they navigated through a world of fears and unknowns. Dave was actively involved in his daughter's care and was well known and respected by the medical staff. He has been a man of character and integrity since I have known him. When we first met, he was obviously concerned with any changes in care for his daughter, and, with great respect and concern, asked about my background and training. He was so concerned for the character of those around his family, that he worked to facilitate a relationship of trust and honesty with those involved in the care of his daughter.

Dave and his wife were able to maintain a truly generous and appreciative manner through all of their trials. Dave helped support the Rainbow Community and became a support to countless families that came down the same path that he encountered with his daughter. His generous nature and love for his family and community, made the information that I read in Crain's Cleveland Business paper unbelievable. Despite this press, he has continued to prove his devotion to his family by providing a safe and supportive community. His family has been through a crisis more intense that any family should have to experience. ***These claims against him should not create more fear and hopelessness than facing a potentially devastating illness for your child, but this unknown, has just as great of an impact, potentially worse.*** (Emphasis added).

*Please see Exhibit D, letter from Nurse Ann Stratton.*

JENNIFER DEUBLE, MA, CCLS, writes, in relevant part:

. . . I met Dave and Michelle Snyder in 2004 when their daughter Page was diagnosed with high risk leukemia. I worked at Rainbow Babies & Children's Hospital as a Child Life Specialist and supported Page and her family throughout her extensive treatment. I remember the moment I met Dave and his family. Page was newly diagnosed, inpatient and Dave and Michelle were dealing with the reality of a catastrophic illness while at the same time they had three children under the age of two. I worked with them almost every single time they were at the hospital; during long inpatient stays, during sedation for invasive and painful procedures, while at clinic for chemo, and a multitude of other different tests and procedures.

I know Dave as Page's dad. He was with Michelle and Page through it all. He juggled work and time at the hospital daily and was present for almost every stay and procedure. He would come in a suit, running form work to meet Michelle and Page for tests, or sit bedside with Michelle and Page at various times of the day and evening. He was always committed, present and available. What really stood out for me as I got to know them was their sense of humor. Humor is the highest order of psychological defense and the healthiest way to deal with terrible adversity. Dave supported his wife and children with grace and in a most loving way, with humor. I have worked on and off with chronically ill children and their families for over 10 years. Every parent I know with a very sick child can share stories of helplessness, powerlessness, exhaustion and overwhelming stress and sadness. I know Dave as patient, kind, and a genuinely good person who was emotionally available and supported his family completely.

Dave and his family have been through so much. The effect and impact of genuine adversity on children is deeply profound. I can only speak about Dave through the lens of being Page's dad and his role as a father. ***He is instrumental***

> *to the stability of his children as they continue to grow up. Now, more than*
> *ever, their children need their parents, their support and their presence. . . .*
> (Emphasis added).

*Please see Exhibit E, letter from Jennifer Deuble, MA, CCLS.*

KELLY LASCHINGER, Page Snyder's Nurse Practitioner for the last 14 years, writes,

in relevant part:

> Dave has always been a pleasure to interact with. When I think back to the early
> days of Page's diagnosis I remember Dave as a father who was deeply concerned
> about his daughter and family. A father who was invested in learning about her
> disease and treatment. When I remember his interactions with Page through it all;
> it just brings a smile to my face. Dave and Page were so silly together and he
> could keep her laughing and playing through some of the most difficult times in
> the hospital.
>
> Dave and Michelle always speak so fondly and lovingly of each other and their
> family. I have always admired them as parents. Dave always interacted with all of
> the medical staff in a kind and cooperative way. He always showed the deepest
> concern for his daughter and family above anything else. This family is a bright
> light and they make people around them smile. Dave and his family have always
> given back from bringing staff amazing baked goods when they came to clinic to
> donating things for other children and families. Dave and Michelle have always
> been generous with their time and have helped so many others in need over the
> years.

*Please see Exhibit F, letter from Kelly Laschinger.*

Charles David Snyder's daughter, PAGE SNYDER, writes:

> I am lucky enough to never have known life without my dad. No matter
> where he has been in the world, it has always felt like he has been at home. Ever
> since I can remember, my dad, a frequent business world traveler, has never gone
> a day without calling home.
>
> In 2004, much of his travel had to stop when I was diagnosed with Acute
> Lymphoblastic Leukemia. My dad managed to balance his hectic work life,
> actively parent 3 toddlers and an infant and dealt with a childhood cancer
> diagnosis. Not a small feat, however, he remained our constant every step of the
> way. Along with my mom, he became my biggest supporter, came to all of my
> treatments, stayed with me in the hospital, *and still to this day is the only person*
> *that can calm me down after my appointments.* During this time we received
> immense support not only from family, but also from my dad's coworkers.

The bond my dad has with his coworkers is very different from that of a normal employer. I have never seen someone so aware of not only his employees, but also their families. Many of his employees and colleagues visited, made us dinners, and did anything to support our family. This did not go unrecognized in my household.

My dad is one of the most generous people you could ever meet. A specific example of this is one year a mom of a player on my brothers basketball team couldn't afford to buy the team pictures of her sons pictures so my dad, anonymously, purchased them and sent them to their house. My dad's motivation is never to be recognized or gain material. It is always to support those he loves and those he employs and their families. He never has viewed his companies as a 200 employee business; he has always viewed them as a 200 member family business.

Your Honor, I'm a senior in high school and preparing for college. My dad encourages me to set goals and fulfill my dreams. He has experience that my mom doesn't and is able to guide me in ways she can't.

Having my dad taken from our daily lives is devastating to even think about. I respectfully ask that you kindly consider an alternative to removing him from our home.

Thank you for reading my letter and taking the true values and qualities of my father into consideration when determining his sentence as it will clearly be a sentence for our entire family.
(Emphasis added).

*See Exhibit H, letter from Page Snyder.*

The instant matter is thus analogous to the circumstances of both *Aihe* and *Spero.* Charles David Snyder is the sole financial supporter of four children, two of which have had significant medical issues. Page Snyder has recurring medical issues that require treatment. Given Mr. Snyder's role as the sole financial support for his family and given his unique role in his children's lives, it is unlikely that Mr. Snyder's wife, Michelle, will be able to be a single parent for their four children through their difficult teenage years *and* also provide for the family without a job. Furthermore, medical professionals have provided opinions that Mr. Snyder's absence would have detrimental effects upon his family and/or children.

Accordingly, this Honorable Court should depart downward because a term of imprisonment will result in the loss of the Snyder family of their sole economic support, as well as the loss of a strong father, who has been a devoted and strong father to his children. The loss of Charles David Snyder that will result from a term of imprisonment will have a devastating effect on his family. Mr. Snyder is the sole financial provider for his wife and their four children. All of the four children are dependents living at home. *See PSR* at 10. Additionally, Mr. Snyder's wife is a stay-at-home mother and generates no income. *Id.* At 14. The Pre-Sentence Report indicates that the family is saddled with debt and living off a small amount of income while the rest goes towards restitution. *Id.* The impact of the loss of the sole economic provider for a family of four children will be enormous, and far more impactful than the regular incidental hardships caused by imprisonment.

Based on the potential aggravation of Page Snyder's mental and physical condition, as well as the likely complete and total economic collapse of the Snyder family if Mr. Snyder is sentenced to any lengthy term of imprisonment, this Honorable Court should grant a downward departure in the within matter and impose a term of probation and/or home detention.

**C)  USSG § 2B1.1 DEPARTURE AS TO COUNT EIGHT**

Further, relative to Count Eight, Charles David Snyder respectfully asserts that USSG § 2B1.1, comment 20(C), provides, in relevant part:

> (C)  Downward Departure Consideration.—There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.

Charles David Snyder respectfully asserts that a downward departure is warranted as to Count Eight as Mr. Snyder previously paid all monies that were withheld from employees of Attevo and Ruralogic, as well as the investment value of all monies, and, accordingly, there is no

restitution owed and there was no economic harm caused. It should be noted that this payment in full, was made prior to the indictment herein and, indeed, prior to Mr. Snyder's knowledge of any criminal investigation. Accordingly, Mr. Snyder respectfully asserts that the guideline as to Count Eight substantially overstates the seriousness of the offense and, accordingly, a downward departure is warranted.

**3)  DETERMINING WHETHER A VARIANCE OUTSIDE THE ADVISORY GUIDELINE RANGE IS WARRANTED UNDER THE AUTHORITY OF 18 U.S.C. § 3553(a) & SENTENCING FACTORS— 18 U.S.C. § 3553(a)**

Charles David Snyder respectfully moves this Court for a variance outside and below the advisory guideline range ultimately determined by this Honorable Court to apply in the within matter. In determining whether a variance (i.e., a sentence outside the guideline range other than as provided for in the Guidelines Manual) is warranted in the within matter, this Honorable Court should take into consideration all of the preceding arguments set forth herein, including Mr. Snyder's motions for downward departures. See, *United States v. Chase*, 560 F. 3d 828 (8th Cir. 2009) (holding, in relevant part, that "departure precedent does not bind district courts with respect to variance decisions, it is merely persuasive authority"). Thus, circumstances that may not warrant a departure and/or that may be prohibited for departure may be considered as a basis for a variance outside the advisory guideline range.

18 U.S.S.G. §3553(a) contains the following factors that the Court may weigh when considering a variance outside of the advisory guideline range. In relevant part, 18 U.S.S.G. §3553(a) states:

> (a) Factors To Be Considered in Imposing a Sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

      (1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

      (2)     the need for the sentence imposed—

          (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

          (B) to afford adequate deterrence to criminal conduct;

          (C) to protect the public from further crimes of the defendant; and

          (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

      (3)     the kinds of sentences available;

      (4)     the kinds of sentence and the sentencing range established for—

          (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines….

      (5)     any pertinent policy statement

          (A) issued by the Sentencing Commission….

      (6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

18 U.S.C. §3553(a)(1-6).

Moreover, 18 U.S.C. §3553(a) places the Guidelines on equal footing with the other factors and judges must exercise sound discretion when imposing a sentence. In addition, 18 U.S.C.§ 3661 provides: "No limitation shall be placed on the [receipt and consideration of] information concerning the background, character, and conduct of a defendant." Charles David

Snyder respectfully asserts that this Honorable Court should consider the following when determining a downward variance.

**(A)    HISTORY AND CHARACTERISTICS - BACKGROUND**

David Snyder respectfully requests that this Honorable Court take into consideration his history and characteristics as more fully set forth below.

Mr. Snyder is 66 years old and has no prior criminal record of any kind. [Presentence Investigation Report, para. 43-47, 51, hereinafter PSR]. He graduated from Napoleon High School in 1970 and was very active in sports and school plays. [PSR, para. 66]

In 1974, Mr. Snyder graduated cum laude in Business Administration from Ohio University.  Although he did not complete a Masters' Degree, he finished all of his graduate course work.  Mr. Snyder maintained a 3.8 GPA in a Masters of Business program at Bowling Green State University. [PSR, para. 66]   Following college, he began a career in the field of information technology where he continues to produce jobs and economic benefits to a number of communities.

Mr. Snyder began his professional career as a consultant to Arthur Anderson Company. Thereafter, in 1993, he founded Realogic, a technology consulting and systems integration firm in Cleveland. *See* PSI, at ¶ 67.

In 1998, Ohio University awarded Mr. Snyder the Medal of Merit, an honor "awarded to alumni who have achieved distinction in their chosen fields."

In August of 2000, Ohio University recognized David Snyder for contributing "about one half of the $1.5 million needed to design and construct the terminal. . .at the Ohio University airport. . ." . The university news release noted:

> "Snyder, who graduated cum laude, is a generous supporter of the university.  He sponsors and funds the REALOGIC Student Organization Program, which

provides financial backing for student professional organizations in the College of Business, and established the C. David Snyder Scholarship for business students....

This summer, Snyder provided his community spirit in his hometown of Napolean, Ohio, by throwing a huge homecoming bash and spearheading a festival that featured the Motown group, The Temptations. Nearly 4,000 people attended the event, which funded scholarships for Napolean High School graduates....Snyder was appointed to the Ohio University Board of Trustees in 1999. He has endowed four scholarships in the College of Business and is a member of the executive board of the Great Cleveland Boy Scouts of America and a trustee of the Great Lakes Science Center."

**(B)¶ ¶ HISTORY AND CHARACTERISTICS – FAMILY SUPPORT**

David has one brother who lives in Massachusetts. He has two children from previous marriages. He has been married to Michelle since 1998 and the couple have four children; Page (age 17), John (age 15), Grace (age 15), and Kate (age 14). [PSI, para. 55] All of his minor children live with him and his wife. A court has never ordered him to pay child support. [PSI, para. 56]. Mr. Snyder was released herein on a personal unsecured bond and has complied with all Court ordered conditions of release. [PSI, para. 6].

His daughter, Page Snyder, was diagnosed in 2004 with Acute Lymphoblastic Leukemia. She has endured surgery, chemotherapy, and numerous hospital admissions as part of her treatment. [PSI, para 57]. Due to the toxic levels of chemotherapy she received at such a young age, she is at risk for late-effect cognitive disorders and heart related issues. [PSI, para. 57].

In 2010, Mr. Snyder's wife, Michelle, was nominated for the Woman of the Year by the Lymphoblastic Leukemia Society for her volunteer work on behalf of children suffering from the condition. "Michelle is a trustee for the Rainbow Foundation of Rainbow Babies and Children Hospital. She also serves on the Family Advisory Council at Rainbows....".

David's son, John, was born with a intracranial brain cyst which was surgically removed in 2004. This condition necessitated neuro and craniofacial surgery. [PSI, para. 58].

David has coronary artery disease.  On June 28, 2018, he underwent heart catheterization and received three stents.  He also suffers from diabetes, high blood pressure, and high cholesterol.  Doctors prescribe Metformin, Brilinta, Lisinopril, and Atorvastatin.  He is currently undergoing cardiac rehabilitation under the care of Dr. Marco Costa. [PSI, para. 60-62].

This Honorable Court should consider the incredible effort and outstanding job David Snyder has done and continues to do as a father and provider to his six children. Further, Mr. Snyder respectfully requests that this Honorable Court consider the possibly catastrophic collateral consequences that a term of incarceration will have on the emotional wellbeing and integrity of Mr. Snyder's family, particularly as four of his children enter their teenage years.

David Snyder is the sole provider for his family. Concomitant with his responsibility as the sole provider for the family, Mr. Snyder also has the extensive responsibilities of fatherhood. Throughout his adult life, David Snyder has managed to juggle these responsibilities with inspirational adeptness. In fact, *almost every single letter* written in support of David Snyder mentions his incredible dedication to his children and his role as a family man above all else.

Charles David Snyder's family members have written letters of support, attesting to the characteristics of Mr. Snyder as a family man, financial provider, and caretaker.

MICHELLE SNYDER, Charles David Snyder's wife of over twenty (20) years, writes, in relevant part:

> . . . He has been a faithful, loving and devoted husband and partner. Together, we have 4 beautiful children; Page, 17 and in 12th grade, our twins, John and Grace, 15 and in 10th grade, and Kate, 14 and in 9th grade. They all attend Rocky River High School. They are our greatest gifts.
>
> * * *
>
> You obviously head the story about David starting Attevo and the difficult financial times our country faced. What you have not are the personal challenges our family faced during this same time. I respectfully ask that you *truly* consider

the difficulties my family, specifically my husband, was dealing with all while building a new business. Not just a business that he wanted to begin because he "was inclined to", but a business that he **needed** to begin in order to regain financial stability.

In January 2004, our (then) 9-month-old son, John, underwent a bifrontal craniotomy to remove a Dermoid Cyst with Intracranial Extension. Basically, we discovered that John had a cyst that started at the bridge of his nose and ended at the lining of hjs brain. If he didn't have the cyst removed, it would likely burst and poison his brain. This would be fatal. After a 7-hour surgery, pediatric intensive care unit (PICU) stay, and several days in the step-down unit at Rainbow Babies & Children's Hospital, we returned home to begin a very delicate recovery process with our son. During this time, my husband actively ran a new business and actively parented 3 very young children. His energy and patience were relentless, not only for our family, but for his employees and their families. Fast forward to July 2004, our fourth child, Kate, was born. Life just got better and busier. Again, Dave never hesitated to embrace the challenges of his growing business, or our growing family.

A few months later, November 2004, our family was faced with a devastating diagnosis for our (then) 3-year-old daughter, Page. She was diagnosed with Acute Lymphoblastic Leukemia and quickly began an aggressive protocol of chemotherapy. This was an incredible shock to our family and friends. Page was hospitalized several times, including most holidays, over the course of her treatment which lasted 2.5 years. We saw our daughter look death in the face, we allowed toxic chemicals to be put into her fragile body, and there were times we didn't know if she would survive. Imagine having to sign a consent form on your child's behalf knowing that death is an option. And yet, my husband, who was just as distraught as I was, continued to build a business, with the life of our family and the families of his employees in the forefront of his mind. . . .

\*\*\*

During the end of Page's treatment, David's father was diagnosed with very serious health issues. David traveled to Florida where his mom and dad resided to help them navigate his father's illnesses. . . . David needed to make the challenging decision on multiple occasions to care for his father and support his mother as he was the sole means of family support for his parents. His father passed in September 2007 and David remains the sole means of emotional support for his mother. She currently lives in Cleveland (since 2013) in a nursing home with advanced stage Dementia. We visit her regularly and David is the only person she recognizes.

Because of our personal connection to Childhood Cancer, we began raising awareness and funds for many related causes and organizations including St. Baldrick's Foundation, The Leukemia & Lymphoma Society, and The Pediatric

Hematology/Oncology Department at Rainbow Babies & Children's Hospital to name a few. . . .

\*\*\*

Our children have suffered emotional and physical trauma that was out of everyone's control - - John, born with a cyst that developed when he was an embryo, and Page developing cancer at age 3. With Page's experience, we have no idea how the toxic treatment will affect her physically in the years to come. She received chemotherapy doses at levels of extreme toxicity at a very young age. She is at risk for heart disease, infertility, liver disease, kidney disease, reoccurrence of Leukemia and secondary malignancies. Ironically, chemotherapy causes cancer. Adverse Childhood Experiences, or ACE's, are being linked to illness in adulthood. She is already compromised. . . .

. . . Your Honor, I kindly ask that you consider the true character of my husband, David Snyder. I trust his value system and his true intent. I com confident that he values our family above all else. He would never intentionally make choices that would compromise our well-being, or the well-being of his employees. I know that he respects the lives and families of others and embraces the challenge of helping to improve communities big and small. Having said that, I am confident that he is genuinely apologetic that decisions he made negatively impacted others; his intent was exactly the opposite. One employee told him that prior to her employment with his company, she lived in her car with her daughters. My husband is an empathetic man. He made decisions thinking he would have time to turn his company around so that he wouldn't have to terminate employees.

\*\*\*

Thankfully, because of my husband's entrepreneurial spirit, he has been able to grow a new business over the last few years. He has worked tirelessly to create jobs, help families and communities and generate enough income to begin making restitution on our many debts. However, since the indictment, he has turned down several opportunities for growth and future business development. He has been on an "unofficial probation" for lack of better words. His character has been defamed locally, but he has been able to establish business opportunities out of state. He has maintained 100% compliance with pretrial services. Because he has restricted his travel, he continues to decline opportunities that would have proven to be lucrative. I am very concerned that incarceration will cause his business, once again, to fold. This will be financial detrimental to our family as he is the bread winner.

*See, Exhibit G, letter of Michelle Snyder.*

JOHN SNYDER, Charles David Snyder's son, writes, in relevant part:

As I get older, I slowly realize more and more just how competent, compassionate, and full of integrity my dad is. Over the fifteen years we have spent together, not only have I been treated as his son, I have been treated as his best friend and companion. Although I could write a trilogy of novels of how much I love, respect, and aspire to be my dad, there are more important things to be expressed in this letter. These are things such as how important he is to my sisters, mom, extended family, and cities and businesses across the world.

. . . On June 12th, I remember he sat our whole family down, including my aunts, and he told us the verdicts of each charge and the possible outcomes. On a day where he realized that he would be criminally punished, he stated "I am just worried about you, your sisters, and your mother." It takes a special breed of human to prioritize five people before himself considering these circumstances.

. . . He, his team, and a large company named DXC have changed the lives of at least 2,000 people in New Orleans. He is extremely crucial to communities as small as Rocky River, Ohio as big as New Orleans, and every size of community in between.

. . . Mr. David Snyder, my dad, is the single greatest man I have ever met, and if I turn out to be half the man he is, then he is also one of the greatest parents in the world.

*See, Exhibit I letter of John Snyder.*

GRACE SNYDER, David and Michelle's daughter, writes, in relevant part:

\*\*\*

My dad is one of the smartest, most considerate, loving, and intelligent people you will ever meet. He has worked hard his whole life and always put others before himself. He values our family and would never do anything to jeopardize the life he and my mom have worked so hard to build together. My dad always puts others first. Sometimes my siblings and I are first, sometimes my mom is first and other times his business and employees are first. My dad is fair even when the fair thing to do isn't always popular with my siblings and me. He always stresses that it is important to behave responsibly and think long term.

My father helps me cope day-to-day. I am a very emotional and somewhat anxious person. My dad helps to calm me down in many situations. For example, I put a lot of pressure on myself to do well in school (an A- can put me over the edge in an Honors/AP level class) and my dad never fails to calm me down, and help me realize that I do not need to put as much pressure on myself as I do. He speaks reason into situations that I find overwhelming and stresses that the important thing is that I do my best.

Additionally, my dad encourages us to be active and be part of something bigger than ourselves. My sister, Kate, and I play volleyball for our high school teams and my dad always does his best to come to every game. He is very "passionate" about cheering on every player on our team and always has words of encouragement. If he cannot attend, he calls us afterward to see how we did and always remembers to wish us luck in advance.

Our father is a busy man, but he never fails to spend time with his family. My dad literally is either working, or with us. I can honestly say that it is a rare event that he and/or my mom are not with us. They have never been the type of parents who leave us for a few days and go on vacation, and rarely are they out with their friends. We are his priority. His business and employees are his priority.

I am not the only one in my family who needs my dad at home. I know that I speak for all of my siblings when I say that we all need him. Our dad is our support system. Our mother, Michelle Snyder, is the best mom that anyone could ask for. However, without our dad at home life would not be the same. I know my mom and dad truly love each other and if my dad is gone I know my mom will struggle. The truth is we can see that she has struggled since my dad was indicted and even more this summer. In addition to emotional support my dad also works hard to financially support my family. Without my dad at home and being able to continue to build his business, I do not know what my family and I would do.

It is my hope that you take the qualities I've shared about my dad into consideration. My dad is a caring, kind, genuine person. He is very important to me and my family and a necessity at home in our daily lives.

*See Exhibit J  letter of Grace Snyder.*

KATE SNYDER, David and Michelle's daughter, writes, in relevant part:

Imagine one man that makes you feel like all of your problems are no longer a reality. Somebody who is beyond selfless, and ALWAYS puts others before himself. A loving, caring, compassionate, articulate man. A person that people wish for. Fortunately, I don't have to imagine or dream. This is my reality.

My father, Charles David Snyder, has an optimistic outlook on the world that translates to everything he does. For example, The C. David Snyder Family Foundation. This foundation was created by none other than C. David Snyder to put more good into the world, his main purpose for everything he does. This was something that my parents, Michelle and David Snyder, donated money to in order to help children in need. This is not necessarily first hand affecting you or me, however the mass amount of people who this had an effect on, an incredibly positive effect, felt in such a way that will leave an enduring impact on their lives.

My dad is not only a generous man outside of family life, but even more within. He would do absolutely anything for his family. He would take a bullet for each and every one of us. My dad no only comforts us when we are stressed or scared, but he even comforts our dog when she is scared during thunderstorms or fireworks. He is a genuinely caring man who we our [sic] beyond lucky to have.

. . . To have him leave, for any period of time, would be detrimental to our family.

. . . My father is the definition of loyalty, love, and care. He is an incredibly hard working man who has learned form a young age that if you want something, you must work for it. He has earned and worked for everything he has. . . .

*See Exhibit K letter of Kate Snyder.*

CHARLENE KESHE, David Snyder's mother-in-law, has also written a letter on behalf of him. In relevant part, Charlene describes David as having been "a faithful and loving husband to my daughter, Michelle, for over 20 years and helpful to me during my difficult years". Charlene further describes how David and Michelle have raised their four children together and opines that "Dave and Michelle are a team in this effort and it would be very difficult for the children, and have a profound impact on them, if Dave were to be removed from the family at such a critical juncture in their lives". As for David's character as an employer, Charlene opines that during the economic crisis, David "fought to maintain his business not for personal gain, but a genuine concern for his employees and their families who depended on the continuation of his business for their well being". Charlene, like many others as set forth herein, describes David as "optimistic" and concludes by opining that David, "believing the financial crisis that affected him and thousands of other businesses, large and small, would quickly turn around . . . [i]t didn't but when possible Dave worked with the IRS to rectify the situation and was well into the process of doing just the same". *See Exhibit L, letter of Charlene Keshe.*

ANTHONY PAGE, David Snyder's father-in-law, has written a letter on behalf of Mr. Snyder. Anthony writes, in relevant part, about David's generosity, stating that "Dave has always shared what he has, whether it be a monetary donation to an organization, or an individual, sharing of guidance from his experiences, or connecting someone with an employment opportunity". Anthony further writes that David's generous spirit also extends to helping others in his family:

> . . . [a]fter the passing of my father, Dave invited my mother to live with Dave and Michelle in their home. My mother was living in my childhood home in the Collingwood neighborhood of Cleveland at the time. She was hesitant to move in with The Snyder's because she didn't want to be a burden to them. Dave graciously told her that it would be an honor to have her and my mother agreed to the move. During the last months of her life she was ab le to live much more comfortably without the use of stairs, making her own meals, doing her own laundry etc. She had the joy of her family with her all day, every day. Dave was also the person who aided EMS in getting my mother safely into the ambulance that was called when she had a stroke. Dave, along with our family, stayed in the hospital until my mother passed and he made the phone calls to notify my family members.

*See Exhibit M Letter of Anthony Page.*

STEPHANIE O'DONNELL, David's sister-in-law, writes, in relevant part, that she is Michelle Snyder's younger sister and that her biological father walked out of her life when she was in her early teens. Stephanie writes that Michelle met David around this time and Dave "entered my life as the loving, father-figure type that I so badly needed". Stephanie further writes how Dave took her under his wing and helped counsel her on what path to take in college. Stephanie writes that David "encouraged me to pursue my passion [music], counseling me that if I did what I loved, somehow success would follow". Stephanie writes that were it not for David, "I wouldn't have followed my musical dreams" and that in doing so, she "thrived in college with achievements in performing and I followed a path that led to a fulfilling, exciting career". Stephanie further writes that, with respect to David, in her opinion, she has "seen nothing but a

hard-working man who deeply cares for everyone around him". Stephanie concludes by stating "[l]ucky for me, Dave entered my life when a toxic force was leaving it and I'm immeasurably better for it."

*See Exhibit N, Letter of Stephanie O'Donnell.*

MARY BETH LIPKA, David's sister-in-law as the partner of Leslie Page (Michelle's sister), writes in relevant part, that she knows David to be a dedicated father and husband. Mary Beth writes that she knows "Dave to be the kind of guy that was doing work in Ohio to provide more jobs in Ohio" and "[h]e fosters that hardworking attitude in his kids with guiding their schoolwork and insisting on doing your best". Mary Beth writes of David charitable donations to Rainbow Babies and Children's Hospital and state that she knows David to be remorseful. Mary Beth concludes by stating that after telling his children what happened in court following the trial, David stated "I'm taking responsibility" and that his main concern is for the well-being of his family.

*See Exhibit O, Letter of Mary Beth Lipka.*

## (C)¶HISTORY AND CHARACTERISTICS – COMMUNITY SUPPORT

Numerous community members, including business associates, a law enforcement officer, a retired Fire Chief, and other friends, have also written letters on Charles David Snyder's behalf, attesting to his character, including the following:

TONY GEORGE, writes that "[o]ne of the things that people know about Dave is that he has helped many young, aspiring business people gain knowledge and professional experience that has led to their success."  Mr. George also writes how Mr. Snyder called and came to Rainbow Babies & Children's Hospital to offer his family much needed support after his son had been diagnosed with Leukemia.

*See Exhibit P, letter from Tony George.*

ROBERT HAUER, writes that when he was hospitalized for a week last year due to an unexpected surgery, Mr. Snyder cleared his schedule in order to be available to help him and his family in a variety of ways.

*See Exhibit Q, letter from Robert Hauer.*

GERALDINE HAUER, writes that last year, when her husband was unexpectedly admitted to the Cleveland Clinic for a quadruple by-pass surgery, Mr. Snyder drove to Pittsburgh to pick up one her daughters to bring her to the hospital after her plan had been diverted to Pittsburgh from Cleveland due to a sudden snow storm.

*See Exhibit R, letter from Geraldine Hauer.*

ERIN HAUER, writes about how Mr. Snyder's exemplary character in moments when the fragility of one's family comes into sharp focus, such as watching Mr. Snyder's attitude through the difficult period of time when his daughter was in the hospital battling cancer to when Mr. Snyder drove to Pittsburgh to pick up her sister and drive her to the Cleveland Clinic so she could be with her father when he awoke from surgery.

*See Exhibit S, letter from Erin Hauer.*

MAURA HAUER, writes about how Mr. Snyder dropped his obligations to drive to Pittsburgh to pick her up and drive her to the Cleveland Clinic in snow storm so that she could be with her family and with her father as he underwent an emergency surgery.

*See Exhibit T, letter from Maura Hauer.*

BRIGID HAUER, writes about the kindness Mr. Snyder's has extended to her and her family during the twenty-three (23) years that their families have been friends, including the

constant reassurance that he provided to them in the waiting room at the Cleveland Clinic during the hours that their father was in surgery.

*See Exhibit U, letter from Brigid Hauer.*

NANNETTE ARCHBOLD, writes that she has known Mr. Snyder for more than thirty-five (35) years, and that Mr. Snyder was part of her support system after she was diagnosed with breast cancer and after she and her husband divorced.  Ms. Archbold writes that she always knew that she could always call on Mr. Snyder if she needed help.

*See Exhibit V, letter from Nannette Archbold.*

TIMOTHY M. GALLAGHER, a 29-year police officer with the Willowick Police Department and President of the Fraternal Order of Police, Western Lake County Lodge 116 and a friend of David Snyder for 14 years, writes, in relevant part, that his son, Timmy, was in Rainbow Babies and Children's Hospital for a bone marrow transplant for his cancer treatment when David and Michelle's daughter, Page, was in for leukemia treatments. Timothy writes that from late November 2004 until January 2005 they spent approximately 6 weeks together in the hospital, 24/7. Timothy writes that they struck up an instant friendship that he hopes will last a lifetime. Timothy further writes that Michelle and David learned that his soon Timmy was a huge fan of the Green Bay Packers and Brett Favre and that David obtained and gave to Timmy as a Christmas gift a number of items personally autographed by Brett Favre, including a helmet, jersey, football and an 8x10 photo. Timothy recalls "I will never forget how amazed and happy this act of kindness made Timmy! **Dave Snyder helped make Timmy's Last Christmas his Best Christmas!!!**" Tragically, Timmy subsequently lost his battle with cancer in May 2005. Timothy writes that the brothers of his FOP lodge named their lodge scholarship after Timmy and the Snyders have been "big supporters of our scholarship fund" and that every year, no

matter the weather, the Snyders come from the westside to the eastside to attend their yearly fundraising reverse raffle. Timothy concludes by stating that the Snyders "have such good hearts", that their friendship "means so much to me and my family!", and that David "is a Good Man and they are a Great Family".

*See Exhibit DD,, Letter of Timothy M. Gallagher.*

FRANCIS WHITTAKER, a retired Painesville Township Fire Chief, writes, in relevant part, that he has known David Snyder for over twenty-five years as a family friend. Francis writes that when he was a fire chief, he had conversations with David about the business world and that David was always willing to share his time and insight into government affairs and economics. Francis writes that he "always considered Mr. Snyder a man of good character and and honest businessman". Francis further writes that David Snyder formed a charitable foundation years ago and that he made an application to the foundation and, as a result, the Painesville Fire Department was awarded a safety grant to purchase a mobile fire safety and disaster trailer, "for teaching kids and adults what to do in the even of fires, tornadoes and other safety related topics". Francis concludes by stating that "Mr. Snyder has been generous to charitable organizations with his time and money over the years."

*See Exhibit EE, Letter of Francis Whittaker.*

GEORGIANNA GARRY, a friend of David Snyder for about 25 years, writes, in relevant part, that David guided her with her small hair business and always made himself available to answer questions and give much needed advice. Georgianna writes that David also helped her husband with his masonry business. Georgianna opines that David Snyder "is the most responsible and hard-working person I know". Georgianna further writes that David and Michelle are "very down to earth and humble" people and that when she read in the newspaper

that David "was said to live a 'lavish lifestyle' I couldn't have disagreed more". Georgianna

writes about the hardship that David and Michelle faced when Page was diagnosed with

leukemia. Georgianna recalls her third child, Liam, being diagnosed with Trisomy 18 and that

during that time, "Dave was a great support and mentor to my husband, Dan, and me".

Georgianna's child lived to be six months old.  During that time, Georgianna writes that David

and Michelle helped her and her husband out with their children, and that after Liam passed,

"Dave continued to support us through this emotional time". Georgianna's fourth child, Danny,

born nine years ago, was born with Down's Syndrome and, again, David and Michelle "were the

first to be by our side". Georgianna writes that Danny is not accepted by all people, but "[i]t's

just the opposite with Dave" who "welcomes our son with open arms" – "he holds him, hugs

him, plays with him, and loves him unconditionally". Georgianna writes that "[w]e are blessed to

have someone like Dave in our lives" "[h]e is a caring, giving and loving man". Georgianna

concludes by opining that "I know his wife and children very well and know that if he is taken

from their family it will have a devastating effect on each one of them" and that David Snyder

"delivers more goodness to society than any person I know".

*See Exhibit FF, Letter of Georgianna Garry.*

DAN GARRY, Georgianna's husband, writes that he has know David Snyder for "20+

years" and that David "helped me out of a toxic business arrangement with an ex business

partner". Dan also writes about how David was there for him when his son Liam passed away by

"offering support and a shoulder to cry on". With respect to his son Danny, who has Down's

Syndrome, Dan writes that "Dave and his entire family accept, love and admire Danny for the

innocent joy he brings to those around him". Dan opines that "[t]his is a great value to pass on to

one's children as we don't receive this acceptance and love from everyone". Dan concludes by

stating "[i]n the course of a lifetime one can only count a couple of people to be true friends and Dave Snyder tops that list".

*See Exhibit GG , Letter of Dan Garry.*

ROBIN SEEDHOUSE, a friend of David Snyder, writes that she met the Snyder family "years ago" through her sister and "quickly became friends as it soon became apparent that the most important thing to Dave and Michelle were their family and friends". Mrs. Seedhouse further writes, in relevant part, that "[f]amily was the glue for our friendship" and that "[f]amily is the most important thing to Dave".

*Please see Exhibit HH, letter from Robin Seedhouse.*

CRAIG SEEDHOUSE, a friend of David Snyder, writes in relevant part that he believes that David Snyder is a "great guy" and that he believes that it is very important for David's four youngest children to have both a mother and father with them each day. Craig writes that "[t]hey have always been great kids and I fear that this could quickly change if their dad is taken from their daily lives".

*See Exhibit II, Letter of Craig Seedhouse.*

ANNE AND MARK SALES, write that their family has known David and his family for 10 years. The Sales state that their children and the Snyder children met and became close friends while attending school together in Rocky River. The Sales write that they have always "know David to be a good friend and family man". The Sales further write that they have always admired David's "interaction and lively support for his children's scholastic and sports events". The Sales state that "David's children are some of the nicest and well-adjusted children that we have had the pleasure of knowing" and that they "attribute their exceptional manners and

conscientious demeanor to the stewardship of both David and Michelle". The Sales conclude by stating:

> . . . We feel that it would hurt the children exponentially to lose their father for any period of time during this critical time in their development. We feel strongly that David is an integral part of keeping their family thriving. His family needs him for both emotional and financial wellness. We implore you to keep the Snyder family intact and allow David to be able to provide the support of a provider, loving husband, and father.

*See Exhibit LL, Letter of Anne and Mark Sales..*

LINDA CANEPA, a Lakewood resident, writes that David Snyder bought his house a couple of years after she did and she got to know him better after his marriage to Michelle and they started a family. Linda writes that Dave was "always busy with work but always made time for his family" and that "[h]e had two children from a previous marriage and always included and took care of them alongside his growing young family". Linda further writes that "Dave also was a good neighbor in times of trouble". Specifically, Linda writes that after their neighborhood suffered damages following the aftermath of Hurricane Sandy, "Dave was one of the first ones out and was questioning who needed help. He offered himself and his resources to the cause, especially to the elderly households on our block."

*See Exhibit MM, Letter of Linda Canepa.*

LAURA O'REILLY, a friend of David and Michelle Snyder for more than twenty years, writes that she was there to see David and Michelle work "tirelessly to keep an up beat and positive home life for the rest of the kids" when Page was diagnosed with early childhood cancer and her subsequent treatment. Laura further writes that "I have never known David to be anything but a trooper and tireless worker for this family so that they would have the greatest life that he could provide for all of them". Laura states that "Dave is a loving husband and father and I know that his wife and young family need him now as much as ever."

*See Exhibit KK, Letter of Laura O'Reilly.*

SEAN T. O'REILLY, has known David Snyder for over thirty years as a friend and colleague. Sean writes that during that time he has known David to be a generous person and a caring father. Sean writes that when his sister was graduating from college, David took Sean's sister and her boyfriend to dinner to get to know her and, with David's help, his sister secured her first job out of school with Anderson Consulting. Sean writes that over the years, he has seen David "repeat this generous action with many individuals whether they were recent college graduates or seasoned executives". Sean writes that "Dave believes in people and their potential" and "gives equal treatment to restaurant workers, civic leaders and corporate executives".

*See Exhibit NN, Letter of Sean T. O'Reilly.*

ANN WEIXEL, the owner of The Ride and Workout, LLC in Lakewood, Ohio, writes that she first became friends with Michelle Snyder at her fitness studio a decade ago. Ann writes that she has "witnessed Dave to be a kind, caring and loving husband, father and friend". Ann writes that David is a "wonderful father" and that his "positive attitude, creativity in business and non-stop energy are infectious". Ann further states that David "demonstrates an excellent work ethic – creating job opportunities for the benefit of others and their communities".

*See Exhibit OO, Letter of Ann Weixel.*

KAREN RENEE WARREN writes that she met Michelle and David Snyder at the Old Stone Church in Cleveland, Ohio twenty years ago. Karen states that she became close friends with the Snyders thereafter and that she has known David to "be a loving, caring family man who is adored by his wife, Michelle, and children". Karen concludes by stating that she is "certain that their father going away for a long period of time will have devastating effects on Dave's four young children."

*See Exhibit  PP, Letter of Karen Renee Warren.*

**(D)¶¶ HISTORY AND CHARACTERISTICS – BUSINESS ASSOCIATES AND COLLEAGUE SUPPORT**

Numerous businessmen, entrepreneurs, business colleagues, and business associates have also written letters in support of Charles David Snyder:

MICHAEL HECHT, President & CEO of Greater New Orleans, Inc., attests to Mr. Snyder's surpassing importance to the continue post-Katrina revitalization of New Orleans.  Mr. Hecht writes that Mr. Snyder helped bring over 2,000 technology jobs to downtown New Orleans, the largest economic development jobs win in Louisiana History and helped negotiate a 25 million dollar performance grant from Louisiana to regional public universities to help develop market-ready technology curricula.

*See Exhibit W, letter from Michael Hecht.*

JOSEPH BURMESTER, writes that he has known and worked with Mr. Snyder for more than 40 years and knows that Mr. Snyder has had a tremendously positive impact on the careers of many people, creating literally thousands of jobs and launching careers that span the globe.

*See Exhibit X, letter from Joseph Burmester.*

EDWARD FITZGERALD, writes that he initially met Mr. Snyder when they both had children bring treated for cancer at Rainbow Babies and Children's Hospital and that the compassion that Mr. Snyder showed him helped him and his family deal with that difficult situation.  Mr. Fitzgerald further writes that years later, he began doing some consulting work with Mr. Snyder and that he observed Mr. Snyder's efforts to bring over 2,000 high paying tech jobs from overseas back to the United States and that the project was ranked as one of the most impactful economic development projects in the country.  Mr. Fitzgerald further writes that while he has been asked a number of times over the course of his career as a former county

prosecutor and former Special Agent with the FBI to write letters regarding sentencing, Mr. Snyder is the first person that he has agreed to write a letter in support of because the profound affect that this Honorable Court's sentencing decision will have, not only on the Snyder family, but on important economic development initiatives.

*See Exhibit Y, letter from Edward Fitzgerald.*

CHRISTINE HEESTAND, writes that Mr. Snyder was a huge source of support for her and her children after her husband's unexpected death in 2008, including assisting them in setting up a memorial fund in honor of her husband.  Ms. Heestand writes that she has known Mr. Snyder for over thirty years and that her husband and Mr. Snyder started a very successful business together in the early 1990s out of a single handshake.

*See Exhibit Z, letter from Christine Heestand.*

THOMAS TURK, writes that he has known Mr. Snyder for at least 40 years and during the period of time that he worked for Mr. Snyder as a Director of Human Resources, Mr. Snyder, did everything strictly "by the book" from a legal, business and ethical perspective.

*See Exhibit AA, letter from Thomas Turk.*

BEVERLY PRESSNALL, writes that she has known Mr. Snyder for 25 years, and that she watched Mr. Snyder grow the technology consulting company that she previously worked at from 3 employees to over 350 employees before he eventually sold it.  She also writes who Mr. Snyder developed a Code of Conduct for the company that was stressed to all the staff and maintained a culture focused on respect for our clients and also their coworkers. She states that he moved his wife's grandparents into his house without a second thought when they became ill. Defendant further asked an Uncle and his Wife to move in with him so that they could be closer to the hospital for cancer treatment. *Id.* Finally, Ms. Pressnall unknowingly echoes the same

sentiment found in other letters written in support of David Snyder when she states that "family comes first with [Defendant]." *Id.*

*See Exhibit JJ, letter from Beverly Pressnall.*

CHRISTOPHER TJOTJOS, writes that he has known Mr. Snyder for approximately twenty years, and writes that Mr. Snyder advised him on how to take his commodity business and turn it into a value-added services provider when his business began to go through a period of financial turmoil.  Mr. Tjotjos recalls Mr. Snyder meeting with him multiple times a year and continuing to provide him with business advice which eventually enabled Mr. Tjottos to sell his business for much more than what his business would have been worth without Mr. Snyder's advice.

*See Exhibit BB, letter from Christopher Tjotjos.*

THOMAS KELLY, writes that he has known Mr. Snyder since the mid 1990s and writes of Mr. Snyder's sponsorships and generosity towards various charitable organizations, providing office space, supplies, equipment, and volunteers, whatever was needed to make the cause a success.

 *See Exhibit CC, letter from Thomas Kelly.*

## (E)¶ ¶ HISTORY AND CHARACTERISTICS – CURRENT AND FUTURE BUSINESS PURSUITS AND OPPORTUNITY

### Creation of Jobs in New Orleans and Bossier, Louisiana

In February of 2014, Charles David Snyder founded Realscape Group which was built on the ideas and products of Ruralogic.  Presently Realscape has 22 employees.

Recently, David Snyder was very instrumental in creating the opportunity for production of 800 jobs in Bossier and 2,000 jobs in New Orleans, Louisiana.  The state was ravaged by Hurricane Katrina.  Mr. Snyder's plan for growth in Louisiana was to encourage the State of

Louisiana to provide monies to local universities to establish a new curriculum.  Students would be educated in information technology for the jobs of the future.  Major corporations in the area would partner with the state and local universities and agree to hire the students at high-paying jobs.

Hewlett Packard merged with CSC (Computer Service Corporation) to form DXC.  DXC is one of the world's largest technology companies. The company hired David Snyder early in 2017 to find a city in the United States whose economic problems would improve significantly by implementing the previously described plan.

David Snyder recommended to DXC to choose New Orleans after studying the economics of 29 other cities.  As noted by a radio broadcast announcing the implementation of this plan: "It was reported that New Orleans beat out 30 other communities to win this latest project which involves bringing 2,000 jobs to the city over the next six years."  Mr. Snyder recommended New Orleans because the labor rates and the cost of doing business were reasonable.  Michael Hecht, President of Greater New Orleans, stated:

> "There was a site selector, a gentleman named Dave Snyder, who really was the lead for DXC.  He is not a DXC employee.  He was a vendor, a contractor, but the key thing about Dave Snyder  is that he had been involved in a previous deal in Louisiana [Bossier] when we brought a company, CSC, Computer Sources Corporation, to the north of Louisiana to Bossier to the Cyber Research Center. There CSC set up an operation which has grown beyond 800 jobs and the reality is that it was the success of CSC and Dave Snyder there in Bossier that gave him the confidence to recommend to the chairman of DXC that they consider Louisiana in their opportunity set."

One representative explained: "The ultimate incentive package includes $25 million to fund grants to Louisiana's colleges and universities to write curriculum tailored to the type of software development that DXC is doing."

On January 29, 2018, Michael Siegel of Corporate Realty, thanked David Snyder "for being the architect...for DXC Technology's selection of New Orleans...but it would not have happened without you" doing "everything you did to make this transformative transaction a reality...".

Mr. Snyder was one of the featured speakers at the Tulane Business Forum on September 21, 2018.  Mr. Snyder "told business leaders not to underestimate the impact of DXC's presence in the city."  "DXC hopes to hire about 80 percent of the Center's 2,000 employees from local universities, an ambitious goal that requires working closely with the universities to ensure that students graduate with the right skills."

Attached hereto as Exhibit W is a letter from Michael Hecht, the President and CEO of Greater New Orleans Inc., Regional Economic Development, attesting to "Mr. Snyder's surpassing importance to the continued post-Katrina revitalization of New Orleans."  The city "was overly reliant on Tourism and Oil/Gas," and needed "to diversify the economy of New Orleans."  Mr. Hecht further writes:

"It is in this context that I came to know Dave  Snyder, approximately two years ago.  Dave was the lead consultant for DXC Technology (DTX), as they explored potential locations for their first domestic "Digital Transformation Center.  DXC is one of the largest technology companies in the world, with about $21B in revenue, and over 125,000 global employees.  In my role as economic lead for New Orleans, I worked closely with Dave for 18 months as we sought to determine if New Orleans was the best match for DXC's North American expansion.  In the end, Dave and DXC management chose New Orleans over 30 other potential locations, and I had the pleasure of announcing, along with the Governor of Louisiana and the Mayor of New Orleans,

that DXC technology would be bringing over 2,000 technology jobs to downtown New Orleans – the largest economic development jobs win in Louisiana history.

Of Dave's many contributions to bringing DXC to New Orleans, perhaps none was as significant as his negotiating a $25M performance grant from Louisiana to the regional public universities, so they could provide workforce training for local residents to take the DXC jobs. Thanks to Dave's work, not only will DXC get the trained workers it needs to grow to over 2,000 in New Orleans, but also schools including LSU, UNO, Southeastern, Southern and Delgado will get millions in support to help develop market-ready technology curricula.  And thousands of people in Louisiana will get great jobs.  This is a huge win/win/win for New Orleans!"

Charles David Snyder respectfully asserts that his role in developing new business as set forth above, as well as the detriment to said new business that would surely result if a prison sentence was imposed, is relevant to the herein requested variance.

In *United States v. Thurston*, 544 F.3d 22 (1st Cir, 2008), defendant was convicted of defrauding the Medicare program of more than $5 million.  Although the guideline range was 63-78 months, the District Court sentenced *Thurston* to 3 months incarceration with 24 months of supervised release.  The post Booker-Gall sentence as affirmed on appeal based on Thurston's "charitable work, community service, generosity with time, and...support and assistance to others."  *Id.* at 26.

In *United States v. Tomko*, 562 F.3d 558 (3rd Cir., 2009), defendant was convicted of tax evasion whereby he deducted as expenses work performed by contractors on his personal residence.  A sentence of three years probation with one year of home confinement, community service and full restitution was affirmed on appeal even though the guideline sentence was 12-18

months.  The appellate court noted that his incarceration would send his company into dire straits financially including the threatened potential loss of jobs for "300 plus employees."  *Id*. at 562.

In *United States v. Howe*, 543 F.3d 128 (3rd Cir., 2008), defendant was convicted by a jury on two counts of wire fraud.  The district court sentenced him to two years probation with three months of home confinement even though the guideline range called for 18-24 months incarceration.  Defendant, like Mr. Snyder, was a devoted husband, father, and son, lead an honorable and lawful life up to that point, was supported by over 40 character letters, many from non-family, and the court was mindful that "running your own business is difficult and can produce financial hardships."  *Id*.

The government appealed and the Third Circuit affirmed the sentence, and also held that defendant accepted responsibility.  Merely because he denied he had the intent "was not denying the guilt of his convicted offense."  *Id*. at 136.  Defendant's conduct was isolated.

Accordingly, Charles David Snyder respectfully asserts that his current business and future business opportunities, as well as the effect that a term of imprisonment would have thereof, are factors that this Court can consider in varying downward.

**(F)**       **ACCEPTANCE OF RESPONSIBILITY**

Charles David Snyder respectfully asserts that he has and will take responsibility for his actions, as more fully argued above and as exhibited by some of the letters attached hereto.

In a letter to this Court Mary Lipka states she was present for the conversation between the Defendant and his children regarding the future. She states that Defendant specifically said to his kids "I'm taking responsibility. Please do not let anyone at school give you a hard time over this." *Id.* Thus, Defendant sincerely expressed to the most important people in the world to him that he was "taking responsibility" for his actions.

65

Additionally, Dr. Issam Nemeh writes in a letter to the court regarding Defendant's contrition and acceptance of responsibility. He writes, "[Defendant] has expressed sorrow and regret for the decisions that he has made." He further writes "This is a man who realizes his wrongs and has been working to right them and continues to be a loving and devoted husband and father." *Id.*

This Honorable Court should recognize and take into consideration during its sentencing the fact that Mr. Snyder truly and sincerely regrets the decisions that he has made and that he fully takes complete responsibility therefore.

## (G) ¶ ¶ HISTORY AND CHARACTERISTICS – CHARITABLE ACTS

Charles David Snyder has a history of contributing money and time as a volunteer in a variety of different organizations to support the community, and specifically contributes to medical causes that are dedicated to combating cancer in children, all as more fully attested to by the letters attached hereto.

This Honorable Court should consider the Mr. Snyder's substantial contributions to the Cleveland area and its citizens in determining the severity of its sentence, and be cognizant of the potential future positive contributions Mr. Snyder can provide if this Honorable Court imposes community control sanctions.

David Snyder has a good relationship with Rainbow Babies and Children's Hospital, and has spent time at the hospital providing support and helping other families deal with the enormous struggle and toll of seeing one's child go through cancer treatment. Moreover Mr. Snyder has served as mentor to many other families and helped them navigate the difficulties of dealing with cancer affecting children. *See letter from Tony George.* In fact, Defendant is known for his contributions and connection to pediatric cancer causes. In addition to his volunteer time,

the Defendant has donated money to local medical institutions as well as Rainbow Babies

Children's Hospital. *Please see letter from Mary Lipka.* Defendant has even helped set up a

memorial fund to combat disease. *Please see letter from Christine Heestand.*

Additionally, David Snyder set up a charitable foundation that dispenses grants. That

foundation successfully provided enough funds to allow the Painesville Township Fire

Department to purchase a mobile fire safety and disaster trailer. *Please see Letter from Francis*

*Whittaker.* Mr. Snyder has also been generous in giving to other charitable foundations with his

time and money over time. *Id.*

In addition to his charitable work, David Snyder currently is Chairman, CEO and

President of Realscape Group, a software and consulting firm. *See PSR at 13.* This corporation

has offices in Cleveland and employs 22 people in the community. *Id.* In the past, Mr. Snyder

has provided employment to hundreds of employees to the benefit of the Cleveland area. This

Honorable Court should consider Mr. Snyder's record of generosity and involvement in the

community during its sentencing, and consider community control sanctions or other terms of

punishment as proper that may allow him to continue to contribute to the community in a

positive manner.

**(H)      NATURE AND CIRCUMSTANCE OF THE OFFENSES**

This Honorable Court should take into account the particular economic circumstances,

lack of malice and non-violent nature of convictions herein in determining whether incarceration

is appropriate.

Charles David Snyder was convicted of offenses herein that occurred during a time of

great economic uncertainty, disaster, and collapse. Although Mr. Snyder clearly made the wrong

decision by taking illegal actions, the acts themselves were based primarily on fear brought on by

the unstable economic climate and Mr. Snyder's desperation at the prospective loss of a company that he had literally built from the ground up.

In the same vein, Mr. Snyder did not commit his criminal actions with malice, nor with the goal of intentional harm to any victims or the U.S. government.  As attested to by several witnesses at the trial, Mr. Snyder believed that the company could survive the economic downturn and be able to become solvent at a later date. Several witnesses testified that it was always the intent to pay the IRS the past due trust fund taxes. Although Mr. Snyder knew his actions were wrong, and takes responsibility for his actions, he respectfully submits to this Honorable Court that the reasons for the actions were not with the intent to harm anyone.

Finally, the nature of the crimes was non-violent. Mr. Snyder did not involve any family, friends, or any other individual in his criminal conduct. Mr. Snyder did not organize a group of individuals in a planned scheme. Instead, the nature of the crimes indicates that Mr. Snyder did his actions alone and as part of a desperate stopgap measure to prevent the destruction of his business. Mr. Snyder at no point in time committed any violent action, nor risked the physical safety of any person during the commission of his acts.

Charles David Snyder does not shirk his responsibility for his actions. However, this Honorable Court should take into account the severe economic climate and concerns driving the behavior behind his acts, as well as the non-violent nature of the crimes when considering his sentence and the level of threat Charles David Snyder poses to the community.

**WHEREFORE,** the Defendant, CHARLES DAVID SNYDER, by and through undersigned counsel, respectfully moves this Honorable Court to sustain his objections to the Presentence Investigation Report and, accordingly, adopt the advisory guideline range asserted herein, and further moves this Court for a downward departure and/or variance downward from

the advisory guideline range into Zone A and respectfully requests that this Court impose a suspended sentence and place him on probation and/or community confinement and/or home detention.

Respectfully Submitted,

/s/ Larry W. Zukerman
LARRY W. ZUKERMAN, Esq. (0029498)
S. MICHAEL LEAR, Esq. (0041544)
Zukerman, Daiker & Lear, Co., L.P.A.
3912 Prospect Ave. East
Cleveland, Ohio 44115
(216) 696-0900 telephone
lwz@zukerman-law.com
sml@zukerman-law.com
Counsel for Charles David Snyder

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was electronically served to all parties on this 1st day of October, 2018 via the Court's electronic filing system.

/s/ Larry W. Zukerman
LARRY W. ZUKERMAN, Esq. (0029498)
S. MICHAEL LEAR, Esq. (0041544)